**G.M., Appellant,**

v.

**TEXAS DEPARTMENT OF HUMAN RESOURCES, Appellee.**

**No. 14448.**

Court of Appeals of Texas, Austin.

Sept. 17, 1986.

Art Keinarth, Reynolds & Keinarth, Smithville, for appellant.

Jim Mattox, Atty. Gen., Edwin N. Horne, Asst. Atty. Gen., Austin, for appellee.

Before SHANNON, C.J., and EARL W. SMITH and GAMMAGE, JJ.

GAMMAGE, Justice.

G.M. appeals from the trial court's judgment based on a jury verdict, terminating her parental relationship with the child J.J.M. This Court will set aside the judgment of termination and remand the cause to the trial court.

The Texas Department of Human Services (formerly the Texas Department of Human Resources, *see* 1985 Tex.Sess.Law Serv., ch. 264, at 2157) petitioned for involuntary termination of the parental rights of appellant and P.M., parents of J.J.M., under Tex.Fam.Code Ann. § 15.02 (Supp. 1986).

J.J.M. was born to appellant on December 19, 1981, in a Giddings hospital. The birth was several weeks premature, and shortly thereafter the child was transferred by her physician to the neo-natal unit at Seton Hospital in Austin because of respiratory problems. The medical evidence indicates that appellant had type B or serum hepatitis when J.J.M. was born. Although the baby did not show signs of infection at birth, she was later diagnosed as being a carrier of hepatitis.

Appellant required further hospitalization in Giddings. Her husband, who was unhappy with her treatment, became angry with the hospital staff and tried to secure her release from the hospital. Appellant's treating physician, Dr. Vocal, was reluctant to allow her to leave because she had poor physical resistance, was very fatigued and was "overextended physically." He finally agreed, however, and she was advised to get bed rest and proper nutrition at home with follow-up clinic appointments. Appellant left the hospital on Christmas Eve 1981 and went to Austin to visit her daughter.

Appellant saw Dr. Cullen on January 6, 1982. The following evening, appellant called an ambulance to her home. Her stated reason for doing so was to take both her and her husband to the hospital for treatment of hepatitis. Her husband became angry with the emergency medical personnel and refused to cooperate or to allow his wife to leave. Sheriff's deputies were called and persuaded him to let his wife go to the hospital. After one day of treatment, appellant again left the hospital.

On January 8, 1982, a social worker at Seton Hospital contacted the Department because of a lack of hospital visits by the M's. Wanda Pace, a Department case worker, went to appellant's home and was told by the parents that they did not intend to remove J.J.M. from the hospital at that time because it would be contrary to medical advice. Appellant was taken by her husband to his parents' home in Louisiana later that day. She was admitted to a Louisiana hospital for three days and then to a psychiatric institution where she remained until at least February 1982. On January 11, Pace was informed by appellant's mother-in-law that appellant was in Louisiana. The next day, Pace spoke by telephone with appellant's husband who made angry remarks about getting all his children and shooting anyone who tried to come after them.

On January 14, 1982, the Department filed its original petition in this cause, and obtained an emergency ex parte order giving it temporary managing conservatorship of J.J.M. This status was continued through temporary orders of the court dated March 25, 1982, and August 27, 1982. After appellant's release from the psychiatric institution, she corresponded with Pace regarding what the Department would require in order to return J.J.M. These negotiations were unsuccessful, and in December 1982 the Department determined to pursue termination against the M's.

At the close of the evidence, the case was submitted to the jury on special issues to determine if termination of each parent-child relationship was in the best interest of the child, § 15.02(2), and whether each parent had

(C) voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months; or

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; or

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child ...

§ 15.02(1). The jury answered "yes" to each of the special issues.

■ By six points of error, appellant challenges the legal and factual sufficiency of the evidence offered to prove the grounds for termination under § 15.02(1)(C), (D) & (E). When confronted with a legal sufficiency or "no evidence" point of error, we are required to consider only that evidence which supports the finding and then in its most favorable light. *Richardson v. Green,* 677 S.W.2d 497, 501 (Tex. 1984); *Shaefer v. Texas Employers' Insurance Association,* 612 S.W.2d 199, 201 (Tex.1981). In reviewing the factual sufficiency of the record in a termination suit, this Court must consider all of the evidence as required by *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951), while applying the "clear and convincing evidence" standard of proof. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985); *Richardson v. Green, supra.* "Clear and convincing" refers to "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In the Interest of G.M.,* 596 S.W.2d 846, 847 (Tex.1980), *quoting State v. Addington,* 588 S.W.2d 569, 570 (Tex.

1979). Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. *Holick v. Smith, supra* at 20.

Appellant's first two points of error challenge the legal and factual sufficiency of the evidence for termination under § 15.02(1)(C). The first requirement for termination under subsection (C) is that the parent voluntarily left the child. *Holick v. Smith, supra.*

■ There is no evidence that appellant *voluntarily* left J.J.M. anywhere or with anyone as that term is contemplated in the statute. In her report to the court of January 15, 1982, Pace indicated that appellant's husband had "threatened to remove [J.J.M.] from Seton Hospital on two occasions against medical advice which would have prevented [J.J.M.] from receiving needed medical treatment." The evidence indicates that the treating physician transferred the baby to Seton Hospital, and that prior to January 14, 1982, appellant had no choice but to leave the child in the hospital or risk jeopardizing her health. On that date, the Department was granted temporary managing conservatorship of J.J.M. and has since maintained continuous possession of J.J.M. Appellant no longer had the power voluntarily to do anything with the child after January 14, 1982. Appellant's first point of error is sustained. Because of our disposition, we do not reach appellant's second point of error.

By her third and fourth points of error, appellant challenges the legal and factual sufficiency of the evidence for termination under § 15.02(1)(D). Termination under that subsection of the statute requires proof that appellant left J.J.M. in a physical environment which was dangerous to the child's physical or emotional well-being. The subsection refers only to the acceptability of the child's living conditions, and does not concern the conduct of the parents toward the child. *Stuart v. Tarrant County Child Welfare Unit,* 677 S.W.2d 273, 280 (Tex.App.1984, writ ref'd n.r.e.);

*In the Interest of T.L.H.*, 630 S.W.2d 441, 446 (Tex.App.1982, writ dism'd).

■ The Department contends that by allowing J.J.M. to remain in foster care, appellant left her child in an environment which endangered the child's emotional well-being. Pace testified that foster care has a negative effect on children because of its temporary nature and because of the unclear roles of the foster parents in the child's development. She outlined a number of detrimental influences this living situation purportedly has on the emotional health of foster children.

This Court finds the Department's position to be entirely untenable. Although foster placement might be a less than ideal arrangement for the emotional health of a child, it cannot *per se* be considered an endangerment to the emotional well-being of a child under § 15.02(1)(D). If there were evidence that this child's particular foster home was dangerous under subsection (D), which there is not, it would be incumbent on the Department, just as it would be on any other legal custodian of a child, to remove the child from that situation. The Department's position before this Court that foster care, arranged and administered by the Department itself, is *per se* dangerous under subsection (D), is more than ironic; it is totally without merit. There is no evidence that appellant knowingly placed or knowingly allowed J.J.M. to remain in conditions or surroundings which endangered her physical or emotional well-being. Appellant's third point of error is sustained. Because of our disposition, we do not reach appellant's fourth point of error.

■ Appellant challenges the legal and factual sufficiency of the evidence for termination under § 15.02(1)(E) by her fifth and sixth points of error. Termination under subsection (E) requires proof that appellant engaged in conduct or knowingly placed J.J.M. with persons who engaged in conduct which endangered the physical or emotional well-being of the child.

At trial, the Department attempted to demonstrate that appellant knowingly engaged in the intravenous injection of drugs during her pregnancy with J.J.M. and thereby contracted hepatitis and passed it on to the child. According to the Department, this conduct and its result endangered the child's physical health and constituted a ground for termination under subsection (E).

Dr. Wermer, who treated J.J.M. at Seton Hospital, testified that a person can contract type B hepatitis in a variety of ways including contact with infected blood products, either through blood transfusions or by injections from unsterilized instruments. The doctor also stated that the disease could be transmitted through sexual contact with, or in rare instances by the bodily secretions of, infected individuals. Estimates on the incubation period for the disease by Dr. Wermer and Dr. Vocal ranged from 45 to 180 days, and both physicians agreed that it is medically impossible to determine the exact date of contraction within the estimated range of time. Dr. Wermer testified that the medical probability that appellant would transmit the disease to her child was 80 to 90 percent, and that in his opinion appellant had contracted the disease during her pregnancy.

Appellant testified that she had a blood test in Louisiana about 45 days before delivery. Dr. Vocal stated that appellant and her husband had mentioned this as a possible means of contraction at the time the disease was diagnosed in appellant. The doctor found P.M.'s behavior inappropriate and consistent with that of a drug user, but found appellant cooperative, usually coherent, and without signs in her demeanor of recent amphetamine use.

Dr. Cullen testified that appellant told her during the January 6, 1982 office visit that she had taken intravenous "speed" five days before. Former deputy sheriff Ron Stewart testified that he met appellant on January 7, 1982, and that she told him she had contracted hepatitis from shooting methamphetamine with dirty syringes. He also stated at trial that appellant had fresh

needle marks on her arms, but no mention of this fact appears in his affidavit made at the time.

The record contains some evidence that appellant engaged in intravenous drug use. The evidence is far from clear and convincing, however, that appellant engaged in this conduct during her pregnancy, or if she did, that this was the producing cause of her hepatitis infection or of her child's health problems. Appellant's fifth point of error, challenging the legal sufficiency of the evidence in support of termination under § 15.02(1)(E), is overruled. Appellant's sixth point of error, challenging the factual sufficiency of the evidence in support of termination under that subsection, is sustained.

Because we are of the opinion that the jury's findings in response to special issues regarding appellant's conduct are not supported by clear and convincing evidence, we reverse the judgment and remand the cause for a new trial.