VANESSA W., Appellant,

v.

TEXAS DEPARTMENT OF HUMAN
SERVICES, Appellee.

No. 05–90–00628–CV.

Court of Appeals of Texas,
Dallas.

April 1, 1991.

Rehearing Denied May 31, 1991.

Before HOWELL,[1] THOMAS and OVARD, JJ.

## OPINION

THOMAS, Justice.

This is an appeal by Vanessa W. (Mother) from an involuntary termination of her parental rights. In five points of error, Mother complains of the legal and factual sufficiency of the evidence to support the jury's findings that: (a) she knowingly allowed her infant to remain in conditions or surroundings which endangered his physical and emotional well-being; (b) she engaged in conduct which endangered his physical and emotional well-being; and (c) termination of her parental rights was in the infant's best interest. In two additional points, Mother complains of the admission of certain hospital records and of the admission of a photograph. We sustain the seventh point of error and hold that the trial court committed reversible error in admitting a photograph of the child with the foster family. Because we find some probative evidence to support two of the statutory grounds for termination and the jury's finding that termination would be in the child's best interest, the trial court's judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

## FACTUAL BACKGROUND

Mother, an unmarried woman, is the natural parent of an infant boy who was ten months old at the time of the trial. On March 15, 1989, Mother arrived at the North Texas Medical Center in McKinney approximately fifteen minutes prior to giving birth to her infant son. Mother, who had received no prenatal care, was admitted as a "walk in" patient. Because Mother appeared to be jaundiced at the time of admission, liver function tests were ordered. The tests confirmed that Mother suffered from hepatitis A, and she was placed in strict isolation. During the ad-

Nancy B. Amick, Plano, for appellant.

Judy Smith Millsap, McKinney, for appellee.

1. The Honorable Charles Ben Howell, Justice, participated in this case at the time it was submitted for decision. Because Justice Howell's term expired on December 31, 1990, he did not participate in the issuance of this opinion.

mission procedures, emergency room nurses noticed fresh track marks on Mother's arms indicating intravenous drug use. Mother acknowledged that she had used drugs during the last week of her pregnancy. Because of suspected drug abuse, hospital social workers were immediately contacted.

During delivery of the infant, there was evidence of fetal distress. At birth, the infant suffered from numerous medical problems. He had respiratory difficulties and exhibited symptoms that were consistent with those of a newborn suffering from drug withdrawal. The symptoms were described as his dusky (blue) appearance, his extreme floppiness, irritability, and being a poor feeder. In addition, the child appeared to be suffering some type of renal insufficiency.

Within hours after the birth of the infant, a hospital social worker obtained a family history. Mother stated that she had been living with the infant's biological father for three years and that she had been physically and mentally abused during this time. She further related that she had placed her other two children, a son twelve years of age and a daughter age six, with relatives because of this abusive relationship. Because of the admitted drug use and the fact that Mother did not have a safe home for the infant or the means to care for him, the hospital social worker contacted the Texas Department of Human Services (the State). Approximately one week after the infant's birth, a State caseworker contacted Mother to ascertain her plans for the infant when he was released.

Based upon the Mother's family history, the lack of a place to care for the child, her "infrequent" visits to see the child after she was discharged,[2] and the concern for the baby's health, the hospital personnel sought the State's help to prevent Mother from taking the infant upon his release. The hospital personnel considered the infant to be a medically "high risk baby" who would require extensive follow-up

medical treatments. The State obtained an ex parte temporary restraining order the day before the child was discharged, and he was immediately placed into a foster home. A hearing was held April 14, 1989, and the State was appointed the temporary managing conservator of the infant.

Approximately two weeks later, a State caseworker met with Mother, and they arranged a "service plan" which, if successfully completed, would enable Mother to regain custody of the infant. Under the plan, Mother was required to:

1. Attend drug screening appointments to assess the most appropriate treatment.
2. Attend and participate in counseling services offered to address drug problems, parenting issues, and depression.
3. Participate in any parenting classes offered.
4. Maintain a residence with basic necessities without dependence or assistance from the abusive, biological father or any other inappropriate adult.
5. Not allow the biological father to continue breaking into her apartment and destroying her personal property.
6. Contact police and the apartment manager regarding any illegal entries by the biological father.
7. Develop independent emotional ties from abusive relationships through counseling.
8. Follow through with income assistance appointments to maintain eligibility status.
9. Request transportation in advance if needed for visits or appointments.

Initially, Mother was allowed to visit with the infant twice a week for two hours each visit. She was consistent in visiting with the child, although it often meant she had to walk some nine to fifteen miles.[3] At first, Mother was cooperative in attending the drug rehabilitation treatment and individual psychological therapy. During this period, Mother frequently changed her resi-

---

2. Mother was released approximately sixteen days before the infant was able to leave the hospital.

3. Mother had no transportation and no consistent source of income.

dence while trying to stabilize her life. Finally, she was able to obtain an apartment and transportation. After a time, her participation and cooperation became sporadic, and the State caseworkers suspected that she was again involved in drug usage. The State ordered random drug screenings, and, after testing positive for amphetamines in two urine analyses, Mother was told that she would have to attend a four-week inpatient, drug-abuse program at the Wichita Falls State Hospital. Mother did not want to leave; however, she reluctantly agreed and voluntarily entered the program on August 3. During the last week of the program, Mother heard that the State had terminated her parental rights to the infant. When she was unable to get any information from the State, she left the hospital against medical advice and returned to Collin County. After talking with State caseworkers, Mother agreed to return to Wichita Falls and complete the program; however, the hospital would not permit her to return without a court order. No order was obtained, and Mother never reentered the program.

During the stay at Wichita Falls, Mother learned that she was again pregnant. When she returned to Collin County in late August, she moved in with Gary Watson, a friend who had previously been convicted of manufacturing and selling amphetamines. According to Mother, the relationship with Watson was a platonic one, and they were helping each other through a "buddy system" to get over their drug-addiction problems. Once she returned to Collin County, Mother failed to pursue any type of counseling.

After Mother learned that the State intended to seek termination of her parental rights, she kidnapped the infant during a supervised visit and kept him hidden for three days. During that time, she moved from house to house, staying with friends. The police finally found her at Watson's house where she was arrested. A petition for termination of parental rights was filed by the State in September 1989 because (a) Mother continued to use drugs during the period she was in therapy; (b) she did not complete the "service plan"; (c) she did not have a stable environment; (d) she did not have steady employment; and (e) the infant who had been in foster care for six months needed a permanent home.

## ADMISSION OF THE PHOTOGRAPH

■ Because the last point of error is dispositive of this appeal, we will address it first. In the seventh point, Mother complains that the trial court erred in admitting a Christmas card photograph of her infant with the Keenes, the second foster family with whom he had been placed. Mother asserts that the photograph was intended to inflame the passions of the jury and that its prejudicial effect greatly outweighed its probative value. See TEX.R. CIV.EVID. 403. She contends that the photo was unfairly prejudicial, arguing that the jury was improperly invited to consider the contrast between her economic circumstances and the affluence of the foster family. Further, Mother argues that the jurors may have been encouraged to believe that they would tear apart the infant's "new" and happy family if they did not find grounds for termination of her parental rights. A trial court has wide discretion in determining the admissibility of photographs, and the general rule is that if a verbal description of the photograph is admissible, then the photograph itself is admissible. The issue on appeal is whether the trial court abused its discretion in admitting the photograph. See State v. City of Greenville, 726 S.W.2d 162, 168 (Tex. App.—Dallas 1986, writ ref'd n.r.e.).

■ Before parental rights can be involuntarily terminated, there must be a finding that the parent has committed one of the proscribed acts in section 15.02(1) of the Texas Family Code and a finding that termination of parental rights is in the best interest of the child. TEX.FAM.CODE ANN. § 15.02 (Vernon Supp.1991). A trial court may not terminate the parental rights solely on the finding that it is in the best interest of the child. Holley v. Adams, 544 S.W.2d 367, 370 (Tex.1976); Williams v. Texas Dep't of Human Servs., 788 S.W.2d 922, 927 (Tex.App.—Houston [1st Dist.] 1990, no writ). In addition, the State has

the burden of proving commission of a prohibited act and best interest of the child by clear and convincing evidence. *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980); *Sylvia M. v. Dallas County Child Welfare Unit,* 771 S.W.2d 198, 200 (Tex.App.—Dallas 1989, no writ). Further, the relationship between a parent and child is constitutionally protected. *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978). The right to raise one's children has been characterized by the United States Supreme Court as essential, as a basic civil right, and as a right far more precious than property rights. *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972).

■ Prior to the admission of the photograph, Dr. and Mrs. Keene testified that they wanted to adopt the child. Extensive testimony was elicited concerning their home, their family, and the infant's present surroundings. The photograph at issue is a family group portrait, imprinted with the words "The Keene Family." It apparently was taken in a park and shows the infant in the center of the photograph held between Dr. and Mrs. Keene whose five other children and one of their dogs are arranged on each side and behind them. With the exception of the dog, the family is looking straight at the camera and all, including the dog, are smiling. The image is one of a traditional, affluent, happy, all-American family. If the photograph is relevant to any issue, it can be relevant only to the issue of the best interest of the child. Such a staged photograph, however, does not present evidence of probative value of any of the factors outlined in *Holley* or of any other issue relevant to the best-interest determination. The only real probative value of the photograph is to show what the nontestifying members of the foster family look like, which is irrelevant to any issue in the trial. The photograph cannot be evidence of the stability of the foster home or the parental abilities of the foster family because the photograph is clearly staged. While the jury is permitted to consider the proposed plans for the child in determining best interest, the Christmas card photograph contains no probative evidence of

this issue. We hold that the probative value of the photograph was greatly outweighed by its prejudicial effect and that the trial court abused its discretion in admitting the photograph.

■ Having found trial court error, we must determine whether it is reversible error. In making this determination, we must decide whether the error amounted to such a denial of the rights of Mother as was reasonably calculated to cause and probably did cause rendition of an improper judgment. *See* TEX.R.APP.P. 81(b)(1). We conclude that admission of the photograph was reversible error because its impact was unmistakable. It invited raw comparison between Mother's circumstances and the foster family's circumstances. It encouraged the jury to make its decisions regarding the merits of termination by considering the favorable environment that could be provided by the foster parents. As the photograph was labeled "The Keene Family," the jury was encouraged to believe that termination was a foregone conclusion and that a decision in Mother's favor would tear apart the infant's "new" and happy family. The natural right existing between parents and their children is of constitutional dimensions, and termination proceedings must be strictly scrutinized. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985); *In re S.H.A.,* 728 S.W.2d 73, 86 (Tex.App.—Dallas 1987, no writ) (en banc). Adhering to the principle of mandatory strict scrutiny, we sustain the seventh point of error.

## SUFFICIENCY OF THE EVIDENCE

Having determined that reversal is required, we must consider the proper disposition of this case. It is necessary to address the legal insufficiency claims because, if they are valid as to all grounds for termination, Mother would be entitled to a rendition in her favor. Conversely, if there is some evidence to support at least one of the statutory grounds and if termination of the parental rights would be in the best interest of the child, the cause must be remanded to the trial court. The State attempted to prove commission of

four of the prohibited acts listed in section 15.02(1). The charge asked the jury to determine whether Mother:

1. Knowingly allowed said child to remain in conditions or surroundings which endangered the physical well-being of said child.

2. Knowingly allowed said child to remain in *conditions or surroundings* which endangered the emotional well-being of said child.

3. Engaged in conduct which endangered the physical well-being of said child.

4. Engaged in conduct which endangered the emotional well-being of said child.

The jury answered "yes" to each of these questions and then found by clear and convincing evidence that termination of the parent-child relationship was in the best interest of the infant. In the first five points of error, Mother challenges each of these findings on both legal and factual sufficiency grounds.

▌ A "legally insufficient" point is a "no evidence" point presenting a question of law. In deciding that question, we must consider only the evidence and the inferences tending to support the finding and disregard all evidence and inferences to the contrary. *King v. Bauer*, 688 S.W.2d 845, 846 (Tex.1985). If a "no evidence" point is sustained and the proper procedural steps have been taken, the finding under attack may be disregarded entirely and judgment rendered for the appellant unless the interests of justice require another trial. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). It is fundamental that these fact findings must be upheld if there is more than a scintilla of evidence in support thereof. *Stedman v. Georgetown Sav. & Loan Ass'n*, 595 S.W.2d 486, 488 (Tex.1979). In reviewing "factually insufficient" points, we consider all the evidence including any evidence contrary to the judgment. *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex. 1980). A finding can be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176

(Tex.1986). When both "no evidence" and "insufficient evidence" points are raised on appeal, we are to rule upon the "no evidence" point first. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981). Thus, we first consider only the evidence and inferences tending to support the jury's findings and disregard all evidence and inferences to the contrary.

▌ In answering questions one and two, the jury found that Mother knowingly allowed the infant to remain in conditions or surroundings that endangered his physical and emotional well-being. Mother strongly urges *G.M. v. Texas Department of Human Resources*, 717 S.W.2d 185 (Tex. App.—Austin 1986, no writ), in support of her legal and factual insufficiency arguments. The State urges that we "reconsider" that case. We decline to do so and rely on it as controlling. There are extensive factual similarities between *G.M.* and our case. In both instances, the hospital personnel were of the view that the mother had engaged in drug abuse while pregnant. Both children were born unhealthy. The *G.M.* infant suffered from serum hepatitis at birth, quite possibly resulting from the use of a nonsterile hypodermic syringe. In our case, the infant did not suffer from hepatitis. In both instances, the child welfare authorities took possession of the infants directly from the hospitals and sought termination when they concluded that the mother could not properly rear the child. In both instances, when presented with very similar questions, the jury agreed with the agency on every question.

With respect to a question inquiring if the *G.M.* mother "voluntarily left the child [with] another," the court stated: "There is no evidence that appellant *voluntarily* left [the child] anywhere or with anyone as that term is contemplated in the statute.... [A]ppellant had no choice but to leave the child in the hospital or risk jeopardizing [its] health." *G.M.*, 717 S.W.2d at 187 (emphasis in original). Our questions one and two inquired about *knowing* conduct of Mother. *Knowing* must by definition be voluntary. By analogy, we hold that there was no evidence in this case that Mother

"knowingly" left the child anywhere or with anyone.

■ The State further argues that there was clear and convincing evidence in support of questions one and two because of the fact that the biological father, with whom Mother had lived during her pregnancy, was abusive, that he may have kicked the fetus, and that, according to Mother's own testimony, he forced her to use illicit drugs. This argument seeks to obliterate the statutory distinction between a dangerous environment and dangerous acts or omissions of specific persons. In considering the grounds for termination set out in questions one and two, we are to focus on the "conditions and surroundings" of the child. This requires a showing that the child has been placed in an environment dangerous to the child's physical or emotional well-being. *In re S.H.A.*, 728 S.W.2d at 84. The acts or omissions of the parents are relevant only to whether they have engaged in conduct that endangered the physical or emotional well-being of the child. *In re S.H.A.*, 728 S.W.2d at 84–85; *see also Stuart v. Tarrant County Child Welfare Unit*, 677 S.W.2d 273, 280 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). To adopt the State's argument, every violation would entitle the agency to two jury questions with respect to the identical act or set of circumstances, *i.e.*, two bites at the apple. Furthermore, the uncontroverted evidence demonstrates that by the time the State petitioned for termination, the biological father had been out of the picture for many months. Remote actions, without evidence of probable repetition, do not constitute grounds for termination. *See Wetzel v. Wetzel*, 715 S.W.2d 387, 390–91 (Tex.App.—Dallas 1986, no writ); *Johnson v. Jefferson County Child Welfare Unit*, 557 S.W.2d 569, 571 (Tex.Civ.App.—Beaumont 1977, no writ).

In support of its position that the conditions or surroundings endangered the infant's emotional well-being, the State argues that Mother's conduct resulted in the child having to remain in foster care and thus, crucial bonding time was lost. This lack of bonding, the State asserts in its brief, emotionally harmed the child to the point that he "will carry permanent emotional scars." A similar argument was made and rejected in *G.M.* In that case, the Department argued "that foster care has a negative effect on children because of its temporary nature and because of the unclear roles of the foster parents·in the child's development." The Department then outlined several detrimental effects this living situation has on the emotional well-being of foster children. The Austin court found the Department's argument "to be entirely untenable." *G.M.*, 717 S.W.2d at 188. To accept the State's position would require us to adopt a rule that children placed in foster homes at such a young age are *per se* emotionally endangered. We decline to adopt such a stance. In our case, there was no evidence presented that the child had been emotionally endangered by the lack of bonding with his mother. Thus, we sustain the no-evidence challenges to questions one and two inquiring about the dangerous environment.

■ The State argues that the following evidence supports the jury's findings that Mother knowingly engaged in conduct which endangered the infant's physical and emotional well-being: (a) Mother's visiting the child only twice after she was released from the hospital; (b) Mother's failure to follow through with the State's "service plan"; (c) Mother's use of drugs during the pregnancy; (d) Mother's continued use of drugs after the child's birth; (e) Mother's attempt to take the child from the hospital before he was medically released; and (f) Mother's kidnapping the child and taking him to an unsafe environment. It is undisputed that, except for the three days when Mother absconded with the infant, she never had possession of him. During this three-day period, Mother moved from place to place and ultimately was arrested at Watson's home. The evidence and inferences tending to support the jury's findings are that Watson was a convicted felon having previously been sentenced for the aggravated manufacturing of methampetamines. Local law enforcement officers had information that the location was being used as a "crack house" and a "chop shop."

There had been a drug raid at the location within sixty days of the time the infant was taken to the house, and law enforcement officers were continuing to collect intelligence information concerning the activities at this location. Further, the house was dirty and the officers observed a loaded shotgun leaning against the front door. After considering only the above evidence and inferences therefrom, we conclude that Mother's actions in kidnapping the child and taking him to Watson's residence are some probative evidence that she knowingly engaged in conduct which endangered the infant's physical and emotional well-being.

We further conclude that the record contains some probative evidence that Mother knowingly engaged in conduct which endangered the physical well-being of the child by her intravenous use of drugs during the pregnancy. Expert testimony was elicited that exposure to amphetamines while *in utero* is dangerous to the child after it is born. Further, there is evidence that this child exhibited symptoms consistent with withdrawal from drugs. Thus, we overrule the no-evidence challenges and hold that there is some probative evidence that Mother knowingly engaged in conduct which endangered the physical and emotional well-being of the child. Because we are reversing on other grounds, we need not determine whether the evidence is factually sufficient to support the jury's findings on these issues.

 In the last question, the jury found that it would be in the best interest of the child to terminate Mother's parental rights. In determining this issue, the trier of fact may examine a broad-ranging variety of factors. Some of these factors as decided by the Texas Supreme Court include:

 a. the desires of the child;

 b. the emotional and physical needs of the child now and in the future;

 c. the emotional and physical danger to the child now and in the future;

 d. the parental abilities of the individuals seeking custody;

 e. the programs available to assist these individuals to promote the best interest of the child;

 f. the plans for the child by these individuals or by the agency seeking custody;

 g. the stability of the home or proposed placement;

 h. the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

 i. any excuse for the acts or omissions of the parent.

*Holley,* 544 S.W.2d at 372. The jury heard extensive evidence concerning the difficult family background of Mother. The family history demonstrated illegal behavior, emotional illness, substance abuse, employment difficulties, financial difficulties, dysfunctional parent-child relationships, and acute spousal abuse. There was evidence that Mother had not been able to consistently care for her other children. At the time of trial, Mother was pregnant with another child and had no independent means of support until after the birth of that child. Mother's parental rights to her twelve-year-old son had been terminated, and he had been adopted by her younger sister. Mother's aunt and uncle were in the process of pursuing termination of her parental rights to her six-year-old daughter. Further, the evidence indicated that Mother never acknowledged that she had any type of emotional problem and in fact blamed all of her difficulties on the State and a conspiracy amongst her family members. After considering only the above evidence and inferences therefrom, we conclude that there is more than a scintilla of evidence to support the jury's finding that termination would be in the best interest of the child. For the reasons previously stated, it is unnecessary to address the factual insufficiency arguments.

## HOSPITAL RECORDS

In the sixth point of error, Mother contends that records pertaining to her inpatient drug treatment were erroneously admitted into evidence in violation of controlling federal law. As we interpret the point

and the argument thereunder, Mother apparently contends that such records were inadmissible because the State failed to follow the applicable statutory procedures. We do not reach the question whether the trial court properly applied the federal standards or whether a proper hearing was held because the case must be reversed on other grounds. Upon retrial, however, the attention of the trial court is directed to observe the procedural requirements of the federal statute. *See* 42 U.S.C.A. § 290ee–3 (West Supp.1990).

We reverse the trial court's judgment and remand the cause to that court for further proceedings consistent with this opinion.