Otis 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 




NO. 3-91-228-CV




D.O.,



 APPELLANT


vs.




TEXAS DEPARTMENT OF HUMAN SERVICES,



 APPELLEE



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT



NO. 478,180, HONORABLE F. SCOTT McCOWN, JUDGE PRESIDING



 





 Appellant D.O. appeals from a decree of termination of parental rights rendered
by the district court of Travis County. The district court terminated the parent-child relationship
between D.O. and his daughter T.N.O. (1) and appointed appellee Texas Department of Human
Services ("TDHS") permanent managing conservator. We will affirm the decree of termination.

 A court may terminate a parent-child relationship if it finds that (1) the parent has
engaged in any of the specific conduct enumerated in the Family Code as grounds for termination;
and (2) termination is in the child's best interest. Tex. Fam. Code Ann. § 15.02(1), (2) (West
Supp. 1993); Texas Dept. of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); Holley
v. Adams, 544 S.W.2d 367, 370 (Tex. 1976); Smith v. Sims, 801 S.W.2d 247, 251-52 (Tex.
App.--Houston [14th Dist.] 1990, no writ). Here, the trial court found: (1) that D.O. knowingly
placed T.N.O., or knowingly allowed her to remain, in conditions or surroundings that
endangered her physical or emotional well-being, § 15.02(1)(D); (2) that he engaged in conduct,
or knowingly placed T.N.O. with persons who engaged in conduct, that endangered her physical
or emotional well-being, § 15.02(1)(E); (3) that a court had previously terminated his parent-child
relationship with respect to another child, § 15.02(1)(M); and (4) that termination was in T.N.O.'s
best interest, § 15.02(2).

 In six points of error, D.O. contends that no evidence and, alternatively, factually
insufficient evidence exists to support the trial court's first, second, and fourth findings. In a
seventh point of error D.O. challenges the constitutionality of section 15.02(1)(M) of the Family
Code that permits termination solely upon a finding that a parent's rights to another child have
been terminated and that termination is in the best interest of the child the subject of this suit.


STANDARD OF REVIEW



 TDHS had the burden to prove the elements necessary for termination by clear and
convincing evidence. In re G.M., 596 S.W.2d 846, 847 (Tex. 1980); Neal v. Texas Dept. of
Human Servs., 814 S.W.2d 216, 222 (Tex. App.--San Antonio 1991, writ denied); see Addington
v. Texas, 441 U.S. 418, 423 (1979) (function of standard of proof is to instruct the factfinder
concerning the degree of confidence society thinks it should have in correctness of factual
conclusions). The clear and convincing standard of proof requires "that measure or degree of
proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth
of the allegations sought to be established." In re G.M., 596 S.W.2d at 847.

 When both no-evidence and factual-sufficiency challenges are raised, we must first
examine the legal sufficiency of the evidence. Glover v. Texas Gen. Idem. Co., 619 S.W.2d 400,
401 (Tex. 1981). In deciding a no-evidence point, we consider only the evidence and inferences
tending to support the finding and disregard all evidence to the contrary. Alm v. Aluminum Co.
of Am., 717 S.W.2d 588, 593 (Tex. 1986); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965);
In re S.H.A., 728 S.W.2d 73, 90 (Tex. App.--Dallas 1987, no writ).

 In deciding whether the evidence is factually sufficient, this Court considers and
weighs all the evidence and should set aside the judgment only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. Cain v. Bain, 709
S.W.2d 175, 176 (Tex. 1986); In re King's Estate, 244 S.W.2d 660, 661 (Tex. 1951); see also
Pool v. Ford Motor Co., 715 S.W.2d 629 (Tex. 1986). The clear and convincing standard of
proof required to terminate parental rights does not alter the appropriate standard of appellate
review. State v. Turner, 556 S.W.2d 563, 565 (Tex. 1977); Meadows v. Green, 524 S.W.2d 509,
510 (Tex. 1975) (evidence is reviewed by only two standards: factual and legal sufficiency);
Browning-Ferris Indus., Inc. v. Zavaleta, 827 S.W.2d 336, 341 (Tex. App.--Corpus Christi 1991,
writ denied); see Director of the Dallas County Child Protective Servs. Unit v. Bowling, 833
S.W.2d 730, 732 (Tex. App.--Dallas 1992, no writ) (clear and convincing evidence standard is
correct standard for jury evaluation and not standard for instructed verdict).

 We recognize that many courts, including this one, have described an intermediate
standard of appellate review in such cases. "[I]t is the duty of the appellate court in reviewing
the evidence to determine, not whether the trier of fact could reasonably conclude that the
existence of a fact is more probable than not, but whether the trier could reasonably conclude that
the existence of the facts is highly probable." Neiswander v. Bailey, 645 S.W.2d 835, 835-36
(Tex. App.--Dallas 1982, no writ); see also Williams v. Texas Dep't of Human Servs., 788 S.W.2d
922, 926 (Tex. App.--Houston [1st Dist.] 1990, no writ); In re L.R.M., 763 S.W.2d 64, 66-67
(Tex. App.--Fort Worth 1989, no writ); G.M. v. Texas Dep't of Human Resources, 717 S.W.2d
185, 187 (Tex. App.--Austin 1986, no writ); compare Doria v. Texas Dep't of Human Resources,
747 S.W.2d 953, 955 (Tex. App.--Corpus Christi 1988, no writ); Baxter v. Texas Dep't of Human
Resources, 678 S.W.2d 265, 267 (Tex. App.--Austin 1984, no writ). In L.R.M., the court
recognized an intermediate standard but proceeded to "determine whether the evidence at trial was
factually sufficient to support a finding of clear and convincing evidence." L.R.M., 763 S.W.2d
at 67. After reviewing these cases, we determine that this suggested intermediate standard of
appellate review is incorrect. See Doria, 747 S.W.2d at 955; Baxter, 678 S.W.2d at 267. The
standard for factually-sufficient review is as stated in In re King's Estate, Cain, and Pool.


BACKGROUND



 D.O. and K.O. married in 1978; they divorced in April 1987. T.N.O. was born
in November 1987; because the couple was unaware of K.O.'s pregnancy in April 1987, the
divorce decree does not mention this child in utero and makes no provisions for her custody or
support. Four other children were born of this marriage. In April 1986, a court terminated the
couple's parental rights to three of these children; K.O.'s parents adopted a fourth child in 1987. 
 Following her divorce from D.O., K.O. married David Englehardt in June 1988;
one child, A.O., was born of that marriage. (Although David Englehardt was A.O.'s biological
father, she bore the same surname as her mother and half-sister, T.N.O.) The trial court
terminated K.O. and David Englehardt's parental rights to A.O., and K.O.'s parental rights to
T.N.O., but this appeal involves only D.O.'s challenge to the termination of his parental rights
to T.N.O.

 Following their divorce, K.O. and D.O. continued to live together off and on, even
after K.O. married David Englehardt. There was evidence that D.O. at times provided housing
and support for not only K.O. and T.N.O., but also for A.O. and David Englehardt.

 Each of these three adults has a criminal record that bears on the matter before us. 
In 1985, K.O. was convicted of injury to a child for failing to protect one of her children from
her then boyfriend, Mario Benevides, and for failing to procure medical treatment for the child
after Benevides placed the child in scalding water. At the time, D.O. had entrusted the children's
care to K.O. because he was in the penitentiary for theft by check; he had previously been
convicted for criminal trespass and the unauthorized use of a motor vehicle. Following the
incident of the scalding water, D.O. and K.O.'s parental rights to three of their children were
terminated in April 1986. In 1990, K.O. was convicted of kidnapping one Robert Walker who
was later murdered. She was sentenced to twenty years and was in the penitentiary during the
time of the trial below.

 When K.O. and David Englehardt married, he was on probation for a forgery
conviction; his probation was revoked when he was convicted of the unauthorized use of a motor
vehicle in July 1989. He served time in prison between July 1989 and March 1990. Soon after
his release, he was convicted of an especially brutal rape of a seventy-year-old woman in May
1990 and was sentenced to ninety-nine years' confinement. Like K.O., he was in state prison at
the time of the trial.

 K.O.'s daughters, T.N.O. and A.O., were taken into custody by TDHS in January
1990 when K.O. was arrested for kidnapping; T.N.O. was two years old, A.O. was one. When
TDHS took possession of T.N.O., she was dirty, had a rash, and required extensive dental care. 
While in a foster home, she acted aggressively toward A.O. and, at one point, the children were
put in separate homes. The children remained in foster care through the date of the trial. Of the
three adults, D.O. was the only one not incarcerated after TDHS picked up the children. He was
entitled to supervised visits with both children for one hour every two weeks while they remained
in foster care.


 SURROUNDINGS AND CONDUCT THAT ENDANGERED T.N.O.



 By his first two points of error, D.O. complains that there is no evidence or
factually insufficient evidence that he knowingly placed T.N.O., or knowingly allowed her to
remain, in conditions that endangered her physical or emotional well-being. § 15.02(1)(D). In
his third and fourth points of error, D.O. raises the same challenge to the trial court's finding that
he engaged in conduct, or knowingly placed T.N.O. with persons who engaged in conduct, that
endangered T.N.O.'s physical or emotional well-being. § 15.02(1)(E). We will discuss all four
points of error together as we review the evidence to see if it is legally and factually sufficient to
uphold the trial court's findings.

 We begin by citing with approval the holding of In re B.R., 822 S.W.2d 103, 106
(Tex. App.--Tyler 1991, writ denied), "that abusive or violent conduct by a parent or other
resident of a child's home can produce an environment that endangers the physical or emotional
well-being of a child within the ambit of section 15.02(1)(D)." But see G.M., 717 S.W.2d at 187-88. There is ample evidence in this record of violent conduct within the household where D.O.
permitted his daughter to live, and where he at times lived as well.

 David Englehardt, by his own admission, has a problem controlling his anger. 
Other evidence established that Englehardt was a violent man. In June 1989, he sexually assaulted K.O. K.O. testified that she could not remember how many times he had assaulted her,
physically and sexually, but she continued to live with him and to have her daughters live with
him after these assaults. She testified that the children were often present when he assaulted her,
but that he had never hurt them. There was testimony that Englehardt physically assaulted other
members of the household, including K.O.'s friend, Christine Carlson. On another occasion,
during a fight with K.O., Englehardt tore up Carlson's house, ripping the telephone out and
breaking personal items.

 D.O. testified that he knew Englehardt was a violent man and that he was aware
of Englehardt's violent relationship with K.O. Indeed, D.O. was often present when the violence
occurred and there was testimony that on more than one occasion Englehardt also assaulted D.O. 
On one occasion, D.O. reported to the police that Englehardt had kidnapped K.O., T.N.O., and
A.O.

 Knowing of the violent relationship between Englehardt and K.O., and knowing
that K.O. had a history of not protecting her children from violent boyfriends, D.O. made no
effort to remove T.N.O. from this unstable household, populated by ex-felons engaged in ongoing
criminal activity, where violence regularly occurred.

 There was evidence that T.N.O.'s physical and emotional well-being was
jeopardized in this environment. When she was picked up by TDHS in January 1990, she was
dirty, had a rash, had not been properly immunized, and suffered from "bottle mouth" (2) that
required extensive dental treatment. While in foster care, T.N.O. exhibited uncontrolled
aggression toward her younger sister, A.O. There was testimony that T.N.O. was
developmentally delayed.

 After careful review of this record, we are persuaded that clear and convincing
evidence exists that is both legally and factually sufficient to support the trial court's finding that
D.O. (1) knowingly allowed T.N.O. to remain in surroundings that endangered her physical or
emotional well-being, and (2) knowingly placed T.N.O. with persons who engaged in conduct that
endangered her physical or emotional well-being. We overrule the first four points of error.


CHALLENGE TO CONSTITUTIONALITY OF SECTION 15.02(1)(M)



 In his seventh point of error, D.O. challenges the constitutionality of section
15.02(1)(M), which permits a court to terminate an individual's parental rights solely on a finding
that there has been a prior termination of that parent's rights to another child and that such a
termination would be in the best interest of the child. Having found that there is legally and
factually sufficient evidence to support the termination of D.O.'s parental rights under sections
15.02(1)(D) and (E), we are not presented with a situation that requires us to determine if
termination based solely on section 15.02(1)(M) is constitutionally sound, and we decline to reach
that issue today. Horton v. Horton, 625 S.W.2d 78, 79 (Tex. App.--Fort Worth 1981, writ ref'd
n.r.e.). We overrule the seventh point of error.


BEST INTEREST OF THE CHILD



 In his fifth and sixth points of error, D.O. challenges the legal and factual
sufficiency of the evidence to support the finding that termination of his parental rights would be
in T.N.O.'s best interest. The supreme court has recognized several factors that may be
considered in determining when termination is in a child's best interest:


 (A) the desires of the child; (B) the emotional and physical needs of the child now
and in the future; (C) the emotional and physical danger to the child now and in the
future; (D) the parental abilities of the individuals seeking custody; (E) the
programs available to assist these individuals to promote the best interest of the
child; (F) the plans for the child by these individuals or by the agency seeking
custody; (G) the stability of the home or proposed placement; (H) the acts or
omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one; and (I) any excuse of the acts or omissions of the
parent.



Holley v. Adams, 544 S.W.2d 367, 372 (Tex. 1976) (footnotes omitted). This list of relevant
considerations is not exhaustive and other factors may be considered when appropriate. 

 The desires of the child were not considered in this case due to her tender age. 
There was considerable evidence that the emotional and physical needs of the child had not been
adequately met when the children were taken into the custody of TDHS in January 1990. As we
have discussed, sufficient evidence exists to establish that the unstable and violent surroundings
of K.O. and David Englehardt's household and the conduct of its members, which sometimes
included D.O. and apparently included Christine Carlson after Englehardt's incarceration for rape,
endangered the emotional and physical well-being of T.N.O.

 That leads us to review the evidence concerning the parenting abilities of D.O., his
plans for the child contrasted with those of TDHS, the stability of his home, and his acts or
omissions that bear on the appropriateness of his parental relationship with T.N.O.

 David P. Rea, the TDHS case worker, testified that D.O.'s history indicated that
he would not be a good conservator for T.N.O.; although there were no reports that he injured
T.N.O., there had been allegations that he both injured and neglected three other children with
whom his parental rights had been terminated. Rea supervised D.O.'s visits with T.N.O. and
observed that she did not relate to him as a father. He also testified that D.O. did not perform
appropriately as a parent, even in the limited period of the one-hour visits. He noted D.O.'s
inability to deal with conflicts between T.N.O. and her younger sister:



 Mr. [O.] would never--could never seem to, you know, intervene beforehand. 
Keeping an eye on [T.N.O.] didn't seem to be something that he did consistently
on a consistent basis. The children would be running around and Mr. [O.] would
be there, sometimes he would be talking more to the caseworker, myself, and the
children would be doing whatever they were doing.



Additionally, Rea saw T.N.O.'s need for dental care and her delay in speech development as
indicators of the limited parenting she had received.

 Dr. Jeff D. Ezell, a psychologist, evaluated D.O. in September 1985, in connection
with the termination of his parental rights to his three other children in April 1986. The trial
court admitted Dr. Ezell's written report into evidence. Ezell described D.O. as "socially inept"
with "chronically poor judgment despite his good intelligence." Additionally, the report contained
this evaluation that bears on his potential parenting skills:



 He shows poor planning capacity, and poor judgement with respect to
consequences of his behavior. Overall, there is severe impairment in the ability
to marshall well-planned sustained responses to meet basic life demands. The
personality and behavioral pattern operating here are essentially passive, and the
client seems to hope that others will take over his responsibilities. . . 

 Mr. [O.] is able to state that it would first be necessary to secure adequate
housing, stable living arrangements, daycare for his children, adequate employment
for himself and sound financial savings before return of the children. However,
his plans and realistic expectations in realizing these goals are very weak and ill-defined. Barring the presence of a great deal of outside help, it appears extremely
unlikely that Mr. [O.] will be able to stabilize his life beyond the general pattern
of adjustment displayed presently and in the past. Sustained social services would
be needed to insure achievement and maintenance of long-term stability of living
for this client.



Further, Ezell was concerned about D.O.'s unhealthy dependence on his ex-wife K.O., despite
her "exceptionally inconsiderate, emotionally abusive" behavior toward him.

 Dr. David Poole, a second psychologist, evaluated D.O. in July 1990. Dr. Poole
administered several psychological tests, reviewed TDHS records, and prepared a written report
that was admitted into evidence. Poole diagnosed D.O. as having "a personality disorder with
narcissistic and dependent features." Poole continued, "[He] doesn't have a sense that he's really
responsible for the outcome of things and what he does." When asked about D.O.'s ability to rear
children, Poole answered that D.O. is distracted by his own concerns and immediate needs. 
Accordingly, "he's not the sort of person we really regard as appropriate for taking care of others
in a practical day-to-day way." As to D.O.'s ability to provide for T.N.O.'s future needs, Poole
reported:



 Mr. [O.] suggested in the course of the interview that he was prepared to take his
children back into his care, yet he acknowledges that he is renting a motel room
for $96.00 a week now, and is speculating about other placements, moving in with
a female friends, etc., in a way that struck me as rather haphazard, particularly
given his unfortunate and unstable track record of the past.



Poole concluded that he did not see D.O. as a viable candidate for primary conservator of T.N.O.

 Andrew Colbert, the children's guardian ad litem, testified that termination of
D.O.'s parental rights would be in T.N.O.'s best interest. Colbert believed that D.O. had
emotionally endangered T.N.O. by allowing her to remain with K.O. and David Englehardt. 
Having known D.O. for several years, Colbert concluded that "[h]e seems to have made little
progress since 1983." In a similar vein, David Rea, the caseworker assigned to this family,
testified that D.O. had not benefitted from the department's services earlier with his other children
and the prognosis was poor for his future effective parenting, even with the department's
assistance.

 In describing his future plans for T.N.O., D.O. testified that he had moved into
a trailer two weeks prior to trial; before that he had lived in a motel and a boarding house. He
testified that he would be relying on Christine Carlson and Debra Clay to help him take care
of T.N.O. Christine Carlson did not testify, but the evidence established that she had a prior
criminal record and had come to live with K.O. when David Englehardt was incarcerated. She
was also the ex-wife of the man that K.O. kidnapped and who was later murdered. K.O. testified
that Carlson was D.O.'s lover; D.O. testified that he and Carlson were just friends.

 Debra Clay did testify at trial and acknowledged that she had been convicted and
served time for manslaughter; she testified that she had been arrested for assault approximately
seven months earlier but those charges had been dropped.

 In reviewing the sufficiency of the evidence, an appellate court must not substitute
its judgment for the factfinder's. In re W.E.R., 669 S.W.2d 716, 717 (Tex. 1984); Texas Educ.
Agency v. Stamos, 817 S.W.2d 378, 388 (Tex. App.--Houston [1st Dist.] 1991, writ denied). The
factfinder at trial is in a position to view the credibility of witnesses based on their presence and
demeanor. The trial judge commented on the importance of demeanor evidence in this case and
noted for the record Ms. Clay's demeanor:



 THE COURT: I didn't want to embarrass Ms. Clay, but I do want to note for the
record that the demeanor evidence in this case has been particularly important, and
the Court has found the demeanor evidence of all the witnesses particularly
valuable and wanted to note for the record that Ms. Clay appeared in court today
in a black T-shirt that had a picture of a bare breasted woman with crossed
ammunition belts carrying a machine gun with the label "Armed and Dangerous."



 Given that K.O. was in prison at the time of the termination hearing, D.O. was the
only parent who could be appointed T.N.O.'s managing conservator. The evidence does not
preclude the possibility that he sought to be named managing conservator, but the testimony and
the argument of counsel is more consistent with his desire to maintain some relationship with
T.N.O.

 Indeed, D.O.'s principal argument on appeal is that while the evidence may
establish his unsuitability to be managing conservator, there is little or no evidence that he should
not see T.N.O. Nothing in Dr. Poole's evaluation, he argues, would preclude D.O. from all
contact with T.N.O. Poole testified only to D.O.'s limitations as a primary caretaker. Therefore,
as D.O. reads this record, the evidence does not support the court's finding that termination is in
T.N.O.'s best interest. We find this argument unpersuasive because it ignores the consequence
to T.N.O. of D.O.'s retention of any parental rights.

 David Rea testified that termination of K.O. and D.O.'s parental rights was
necessary in order for T.N.O. to be eligible for adoption. Rea reported that the agency proposed
to find an adoptive home for T.N.O. and her sister, A.O. He testified, subject to cross-examination, that the children's youth and other factors made them good candidates for a speedy
adoption. The factfinder was able to weigh the credibility of this witness, along with the
credibility of D.O. in describing his plans for T.N.O. As Rea pointed out, the consequence of
not terminating D.O.'s parental rights would be to make TDHS T.N.O.'s permanent managing
conservator, keeping her forever in foster care and not free for adoption. He testified that this
would not be in T.N.O.'s best interest.

 Andrew Colbert, the guardian ad litem, testified that adoption was in T.N.O.'s best
interest because it offered her the best chance to enjoy a stable and nurturing environment. Both
Rea and Colbert testified that naming the agency as permanent conservator would subject T.N.O.
to the instability of numerous foster care placements and deprive her of a chance for the one-on-one attention she might receive in an adoptive home.

 Even K.O. admitted on cross-examination that terminating all three parents' rights
to permit T.N.O. and A.O.'s adoption would be in her daughters' best interest: "And I think that
if our rights are terminated, the girls being put up for adoption, they might accidentally have a
chance to lead a normal happy life."

 The trial court is not required to ignore the consequence of its failure to terminate
a parent's right to visit with his child. When the only available parent is not suitable as a primary
caretaker, as the evidence showed D.O. is not, the trial court could properly determine that the
impermanent foster care arrangement that would be mandated if D.O. retained any parental rights
was not in T.N.O.'s best interest.

 The Holley v. Adams test focuses on the best interest of the child, not the best
interest of the parent. We find the court properly considered the emotional and physical needs
of this child, the emotional and physical dangers confronting her, the parenting ability of D.O.,
his ability to benefit or not benefit from assistance with his parenting, his future plans for the
child's care versus the agency's plan to find her an adoptive home, his lack of stability in his
personal life despite his recent job stability, and his past omissions in removing this child and
other children of his from dangerous situations. It may well have been in D.O.'s best interest to
continue to have limited access to his daughter, but the evidence is legally and factually sufficient
to support the trial court's decision that it was in T.N.O.'s best interest to terminate D.O.'s
parental rights in order to make possible her future adoption. We overrule the fifth and sixth
points of error.



CONCLUSION


 Because there is legally and factually sufficient evidence to support all four of the
challenged findings that justify terminating D.O.'s parental rights to T.N.O. under section 15.02
of the Family Code, we affirm the trial court's decree terminating D.O.'s parental rights.



 

 Bea Ann Smith, Justice

[Before Justices Powers, Aboussie and B. A. Smith]

Affirmed 

Filed: March 17, 1993

[Publish]
1.   By the same order, the district court terminated the parent-child relationship between
T.N.O. and her mother.
2. The TDHS caseworker testified that "bottle mouth" occurs when a bottle of milk or juice
is left in a child's mouth for long periods of time, causing the teeth to rot.