Susan Marie STUART and Lloyd Leroy Stuart, Appellants,

v.

TARRANT COUNTY CHILD WELFARE UNIT, Texas Department of Human Resources, Appellees.

No. 2–84–102–CV.

Court of Appeals of Texas, Fort Worth.

Sept. 27, 1984.

*1983, 68th Leg., p. 1587, ch. 303, sec. 9*) have the      same "Sec. 4(a)" designation.

Alley & Alley and Richard Alley, Fort Worth, for appellants.

David L. Richards, Asst. Dist. Atty., Fort Worth, for appellees.

Before FENDER, C.J., and ASHWORTH and BURDOCK, JJ.

## OPINION

FENDER, Chief Justice.

The Texas Department of Human Resources [hereinafter TDHR] instituted this action against Lloyd and Susan Stuart under TEX.FAM.CODE ANN. Sec. 15.02 (Vernon Supp.1984) in order to terminate their parental rights with regard to their natural son, Jeremy Duane Stuart. Violet and Freeman Gunter, the grandparents of the children and parents of Susan Stuart, intervened in the suit in order to petition the court for custody of the child in the event that the Stuarts' parental rights were terminated. Trial was to the court, which found that Lloyd and Susan Stuart had (1) been the major cause of Jeremy's failure to attend school as required by the Texas Education Code, TEX.EDUC.CODE

ANN. Sec. 1.01 *et seq.* (Vernon 1972 and Supp.1984); (2) knowingly placed and knowingly allowed Jeremy to remain in conditions and surroundings which endangered his physical and emotional well being, and (3) engaged in conduct and knowingly placed Jeremy with persons who engaged in conduct which endangered his physical and emotional well being. The trial court further found that (4) it was in Jeremy's best interest to terminate the parent-child relationship and appoint the Tarrant County Child Welfare Unit of the TDHR as managing conservator with authority to place Jeremy for adoption, and (5) it was not in Jeremy's best interest to place him in the custody of the Gunters. As a result of these findings, the court entered a decree of termination from which Lloyd and Susan Stuart appeal.

We affirm.

In points of error one through five, the Stuarts attack the sufficiency of the evidence to support the trial court's findings and judgment terminating the parent-child relationship and appointing the TDHR as managing conservator. Specifically, the Stuart's claim that there is no evidence, or alternatively insufficient evidence, to support the findings of the trial court stated above. Before we address the Stuarts' arguments, however, we must first set forth the proof requirements and the standard of review for parental rights termination cases.

■ Section 15.02 TEX.FAM.CODE ANN. (Vernon Supp.1984) provides in pertinent part:

A petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that:

(1) the parent has: ...

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; or ...

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the

physical or emotional well-being of the child, or ...

(J) been the major cause of:

(i) the failure of the child to be enrolled in school as required by the Texas Education Code....

and in addition the court further finds that:

(2) termination is in the best interest of the child. The statute makes clear that in order to have parental rights involuntarily terminated, the petitioner must establish one or more of the acts or omissions listed under subdivision (1), and must additionally prove, as required under subdivision (2), that termination is in the best interest of the child. *In the Interest of S.K.S.*, 648 S.W.2d 402 (Tex.App.—San Antonio 1983, no writ). Both elements must be established and the requirements of subdivision (1) are not excused because the court is of the opinion that the subdivision (2) requirement has been proved. *Wiley v. Spratlan*, 543 S.W.2d 349 (Tex.1976).

■ The standard of proof required in order to terminate the parent-child relationship is "clear and convincing evidence," *In the Interest of G.M.*, 596 S.W.2d 846 (Tex. 1980). This standard is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In the Interest of G.M., supra.* When the sufficiency of the evidence to support a termination is challenged, therefore, the appellate court must determine if there is "clear and convincing evidence" to support the required findings. *See McAdoo v. Spurlock*, 632 S.W.2d 224 (Tex.App.—Austin 1982, no writ).

In light of the above standards, we now turn to a consideration of the Stuart's first five points of error in which they attack the sufficiency of the evidence to support the findings and the judgment. The Stuarts first argue in all five points that there is no evidence, or alternatively insufficient evidence, to support the trial court's conclusion that they (1) knowingly placed and knowingly allowed Jeremy to remain in

conditions and surroundings which endangered his physical and emotional well being, and (2) engaged in conduct and knowingly placed Jeremy with persons who engaged in conduct which endangered his physical and emotional well being. Thus, they claim, the trial court could not properly have relied on subdivision (1)(D) or (E) to establish the subdivision (1) requirement for termination under sec. 15.02.

It should be noted at this point that these sufficiency of the evidence challenges, as well as the other sufficiency of the evidence challenges contained in the first five points of error, are stated as "insufficient evidence" and "no evidence" points. As we have just discussed, however, we are bound to review the evidence using a "clear and convincing standard." *In the Interest of G.M., supra.* Therefore, we will uphold the trial court's findings challenged by the Stuarts only if those findings are supported by clear and convincing evidence. In order to make such a determination, we must briefly review the facts of this case.

The record in this case reveals that Lloyd Stuart is an auto mechanic and body work man by trade. For a number of years Mr. Stuart earned a living as an itinerant mechanic, moving his family weekly. Apparently six to nine months prior to the institution of this suit, however, Mr. Stuart began having eye trouble which prevented him from working as a mechanic. As a result he resorted to living with his wife and children in a camper truck, and driving the truck from town to town in order to sell tools at flea market sales. Since the filing of this action, however, Mr. Stuart's eyes have cleared and he is now employed at a stationary job.

Jeremy, the child who is the subject of this suit, is the only survivor of three children born to Lloyd and Susan Stuart. Jeremy's younger brother, Jamie, died at age ten months from what Mrs. Stuart described as "infant death syndrome." Jeremy's younger sister, Michelle, died at age three from severe burns sustained in a fire in the Stuart's camper, which was parked at "Trader's Village," a flea market located in Grand Prairie.

Much of the testimony at trial covered the events surrounding the death of Michelle Stuart. The morning after they arrived at the "Trader's Village" flea market, Lloyd and Susan Stuart left Michelle unattended in their camper while they took Jeremy out to help sell flea market goods. When the Stuarts left Michelle, she was sitting on a mattress located above a lighted gas stove. A few minutes later Jeremy returned to the camper to put away some money, and discovered a fire in the camper.

Apparently Michelle had climbed down onto the stove in an attempt to get from the mattress to the floor of the camper, and in the process caught her clothing in the stove's flame. Two paramedics were called to the scene, and they discovered that 90% of Michelle's body was covered with third degree burns. One of the paramedics also noticed a visible amount of dried blood in the child's mouth, a condition which could not have been caused by the fire. Both paramedics testified as to the visible lack of emotion on the part of Mr. and Mrs. Stuart, and one paramedic testified that Mrs. Stuart told him the child's name was "Perkins" and not Stuart.

In an effort to get Michelle to the hospital as quickly as possible, the paramedics called in a helicopter. While the paramedics were waiting for the helicopter to arrive, the Stuarts hastily began packing up their camper for a quick departure. When one of the other vendors at the flea market asked Mrs. Stuart if she wanted to ride with Michelle to the hospital, Mrs. Stuart responded "No, she won't be afraid. She can go by herself." The Stuarts then got in their camper and left the state with the intention of driving to Indiana to leave Jeremy with Mrs. Stuart's parents.

When Michelle arrived at the hospital, she was treated by a Dr. Ann Williams. Dr. Williams observed full thickness burns over the child's entire body, except under her armpits where the burns were only partial. Dr. Williams also noted that Michelle was in an extremely emaciated condi-

tion. Although Michelle was three and one-half years old, she weighed only seven and a half pounds, which is at the 50th weight percentile for a nine-months-old child and not even on the scale for a three year old. Further, Dr. Williams observed that the child's teeth had been loosened, and testified that neither the poor condition of the teeth nor the emaciation could have been caused by the fire.

As a result of the severity of her burns, Michelle died several hours after being admitted to the hospital. The Stuarts never went to the hospital to check on Michelle's condition, and they did not contact the hospital until two days later when Lloyd Stuart called under an assumed name to find out what had become of Michelle. After learning of the child's death, Mrs. Stuart called Grand Prairie Police Detective Harold Rhodes from Oklahoma and asked whether it was possible for the county to bury Michelle. Detective Rhodes then persuaded the Stuarts to return to Grand Prairie to discuss the matter. When the Stuarts arrived in Grand Prairie, Jeremy was taken from them and placed in the custody of the TDHR.

Mrs. Stuart testified at trial that she and her husband did not go to the hospital because they had never enrolled Jeremy in school, and were afraid that the authorities would take Jeremy away from them. Mrs. Stuart's explanation for failure to place Jeremy in school was that the family was "travelling around the flea market circuit and were not settled in one place long enough." Mrs. Stuart also testified that she and Mr. Stuart were aware that Michelle occasionally climbed down onto the stove in order to get to the floor of the camper. Additionally, she admitted that Michelle had never been immunized, and that although Michelle could say a few words, at age three and one half she was unable to put sentences together. Mrs. Stuart denied that Michelle was unhealthy, however, and stated that she ate well and was growing.

After being taken into custody of the TDHR, Jeremy was interviewed and tested by a number of mental health professionals. Dr. Ewing Cooley, a psychologist, performed an evaluation on Jeremy, and during the testing noticed that Jeremy was a particularly fearful child. Dr. Cooley testified that he has evaluated a number of children, including abused children, and that Jeremy was more afraid of the testing than any child he had ever seen. Guidance Counselor Jerry Terhune, who engaged in a number of "play therapy" sessions with Jeremy, confirmed that Jeremy is a child very fearful of his circumstances. Terhune also noted that Jeremy feels responsible for his sister's death, and believes that he should have somehow prevented it.

Jeremy was also interviewed by TDHR social workers Kathy McGinnis and Margaret Townsend. During one interview with McGinnis, Jeremy related that his parents would punish Michelle by pinning her in a towel so that she was unable to move. He also told the same story to Dr. Cooley. Although Jeremy later retracted the statement, he did so only after a visit with his parents. During another interview, Jeremy was asked by Margaret Townsend how his parents taught Michelle that the stove was hot. According to Townsend, Jeremy became very upset at the question and said, "You'll have to ask my mama."

In support of their argument that the trial court erred in finding that they engaged in conduct and knowingly placed Jeremy with persons who engaged in conduct which endangered his physical and emotional well being, the Stuarts contend that there is no showing of an unstable or immoral family environment or that any abuse was ever directed at Jeremy or occurred in his presence. The Stuarts further claim that in order to support the termination decree, the trial court relied not on testimony concerning their treatment of Jeremy, but rather on evidence regarding the accidental death of Michelle. Such evidence, they argue, has nothing to do with Jeremy and is irrelevant to this case. We disagree, however, with the Stuarts' contentions.

■ In general, Sec. 15.02(1)(E), which authorizes a court to terminate the parental relationship if the court finds that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical and emotional well being of the child," requires that such conduct have been committed in the presence of the child. *Lane v. Jefferson County Child Welfare Unit*, 564 S.W.2d 130 (Tex.Civ. App.—Beaumont 1978, writ ref'd n.r.e.). Section 15.02(1)(C) does not, however, require that the questioned conduct be directed towards the child nor cause him physical harm. *Wray v. Lenderman*, 640 S.W.2d 68 (Tex.App.—Tyler 1982, no writ). It is enough, therefore, if an act is committed in the child's presence in such a manner as to actually endanger his physical or emotional well being. *Lane, supra*, at 132.

Having reviewed the record in the case at bar, we find clear and convincing evidence that the Stuarts have engaged in conduct which endangers Jeremy's physical and emotional well being. Although there is only meager evidence that Lloyd and Susan Stuart ever abused Jeremy, the record clearly reflects that the Stuarts did neglect and abuse Michelle on a continual basis. Michelle's emaciated and severely malnourished condition, her loosened teeth, and dried blood in her mouth, and Jeremy's description of how she was punished by being pinned in a towel, are all clear examples of systematic inhumane treatment of Michelle by Lloyd and Susan Stuart. The Stuarts' lack of concern for Michelle's well being is further demonstrated by their failure to immunize Michelle, their characterization of her as "normal" and "healthy," and their willingness to leave her unattended in the camper with a lighted stove when they were aware that she used the stove to climb down from the overhead mattress to the floor.

■ Because Jeremy was living in close association with Michelle and his parents, it is obvious that the abuse of Michelle occurred in his presence. The evidence indicates that as a result of his witnessing such abuse, Jeremy has become an abnormally fearful and anxious child, and that he blames himself in some way for his sister's death. It was certainly reasonable for the trial court to conclude that Jeremy's fears and anxieties evidenced emotional damage to him, and that if the Stuarts were allowed to continue to exercise parental rights, Jeremy's emotional well being would be further endangered. In addition, the trial court could reasonably have concluded that to leave Jeremy with parents who have shown that they are capable of abusing and neglecting a child would be endangering not only Jeremy's emotional, but also his physical well being. We hold, therefore, that the trial court did not err in concluding that the Stuarts engaged in conduct dangerous to Jeremy's physical and emotional well being, and accordingly conclude that the sec. 15.02 subdivision (1) termination requirement is satisfied under sec. 15.02(1)(E).[1]

In points of error two and five, the Stuarts argue that there is no evidence, or alternatively insufficient evidence, to support the trial court's finding that they knowingly placed and knowingly allowed Jeremy to remain in conditions or surroundings which endangered his physical and emotional well being. Although we review this argument using the clear and convincing standard, we agree that there is no evidence to support the conclusion of the trial court.

1. We note at this point that not only did the trial court find that the Stuarts engaged in conduct which endangered Jeremy's physical and emotional well being, it also found that the Stuarts placed Jeremy *with persons* who endangered his physical and emotional well being. We find no evidence in the record to support this additional finding. In order for parents' conduct to fall within the sec. 15.02(1)(E) termination provision, however, the court need only find conduct by the *parents themselves* which endangered the child's emotional or physical well being, and additionally finding that the parents have placed the child *with persons* who engaged in conduct endangering the child is unnecessary. We hold, therefore, that the trial court's error in making this additional finding is harmless.

■ In general, knowingly placing or knowingly allowing a child to remain in conditions or surroundings which endanger the child's physical or emotional well-being is prohibited by sec. 15.02(1)(D). Termination of parental rights under sec. 1(E) requires a showing, by clear and convincing evidence, that the child has been placed in a *physical environment* dangerous to his physical or emotional well being. *Interest of T.L.H.*, 630 S.W.2d 441 (Tex.App.—Corpus Christi 1982, writ dism'd). Thus, subsection (1)(D) refers only to the acceptability of the child's living conditions, and does not concern the conduct of the parents toward the child. *Interest of T.L.H., supra,* at 446. In the case at bar, there is no evidence that Jeremy's physical living conditions were at all unsanitary. We hold, therefore, that the trial court erred in finding that the Stuarts knowingly placed or allowed Jeremy to live in conditions or surroundings which endangered him.

In their next sufficiency of the evidence challenge, also contained in points of error two and five, the Stuarts argue that there is no evidence, or alternatively insufficient evidence, to support the trial court's finding that the Stuarts were the major cause of Jeremy's failure to be enrolled in school. Although the Stuarts admit that they never enrolled Jeremy in school, they argue that it was impossible for them to do so because Mr. Stuart's only source of income was that which he earned by travelling around the country on the flea market circuit. Thus, they contend that the trial court could not have relied on sec. 15.02(1)(J)(i), which provides that the subdivision (1) termination provision of sec. 15.02 is satisfied when the parents are the major cause of the child's failure to be enrolled in school, to satisfy the subdivision (1) requirement in this case.

In the alternative, the Stuarts argue that sec. 15.02(1)(J)(i) is unconstitutional as to them. They claim that sec. 15.02(1)(J)(i) discriminates on the basis of poverty because it allows the termination of parental rights of persons who are too poor to enroll their children in school. By creating different classes of persons based on wealth, the Stuarts argue, the provision denies them equal protection of the law *in violation* of the Texas and U.S. Constitutions. TEX. CONST. art. I, sec. 3; U.S. CONST. AMEND. XIV. We cannot agree, however, either with this constitutional argument or the sufficiency of the evidence claim.

■ In general, the guarantee of equal protection is not a source of substantive rights or liberties, but a right to be free from invidious discrimination in statutory classifications. *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). In order to attack a law on equal protection grounds, therefore, a challenger must demonstrate that the law classifies persons in some manner.

■ In the instant case, the Stuarts appear to be claiming that sec. 15.02(1)(J)(i) creates two classes of persons: (1) those with sufficient funds to enroll their children in school; and (2) those who are not wealthy enough to do so. We fail, however, to see such a classification. The requirement that a child be enrolled in school cannot classify persons on the basis of poverty because the public school system in Texas is provided to children without charge. Furthermore, the Stuarts have made no showing that they themselves were too poor to enroll Jeremy in school, or that Mr. Stuart could not have earned a living in a job which did not require such extensive travel. They have also offered no explanation as to why they did not put Jeremy in school during the time before they began their flea market travels. We hold, therefore, that the Stuarts have failed to show that sec. 15.02(1)(J)(i) is violative of their right to equal protection of the law. We further hold that the evidence clearly and convincingly demonstrates that Lloyd and Susan Stuart were the major cause of Jeremy's failure to be enrolled in school, and that the trial court did not err in so holding.

In their final challenge to the sufficiency of the evidence, the Stuarts contend in points of error two and five that there is no evidence, or alternatively insufficient evi-

dence, to support the trial court's conclusion that termination is in the best interest of the child. The Stuarts are apparently claiming, therefore, that even if the trial court properly found that the Stuarts fell within one or more of the sec. 15.02(1) termination provisions, the court nevertheless could not terminate the parent-child relationship because the sec. 15.02(2) condition that termination must be in the child's best interest has not been met. In the alternative, the Stuarts argue that even if the trial court acted properly in terminating the relationship, there is no evidence or insufficient evidence to support the court's conclusion that it was not in Jeremy's best interest to place him with the Gunters. We find no merit to any of these contentions.

■ In general, a number of factors which should be considered by the trial court in determining whether termination is in the best interest of the child are:

(1) The emotional and physical needs of the child now and in the future;

(2) The emotional and physical danger to the child now and in the future;

(3) The parental abilities of the individual seeking custody;

(4) The plans for the child by the individual seeking custody;

(5) The acts or omissions of the parents which may indicate that the existing parent-child relationship is not a proper one; and

(6) Any excuse for the acts or omissions of the parents.

*Hellman v. Kincy,* 632 S.W.2d 216 (Tex. App.—Fort Worth 1982, no writ.)

■ In the case at bar we have found clear and convincing evidence that the Stuarts endangered Jeremy's emotional well being in the past and that danger of emotional and physical harm to Jeremy would continue if he remained with his parents. Further, there is clear evidence that it would be in Jeremy's best interest for him to be in an adoptive home rather than with his parents. Dr. Ewing Cooley testified that Jeremy's psychological tests were suggestive of (1) educational experience deprivation; (2) a language develop-

ment delay; or (3) language delay caused by experience deprivation. Because of these problems, Dr. Cooley stated that Jeremy needed to be in a stable environment in which he could attend school and develop normal relationships with other children. In addition, guidance counsellor Jerry Terhune testified that Jeremy needs to be in a home environment with warm, caring parents. Finally, TDHR social worker Kathy McGinnis testified that Jeremy is very adoptable, and that he should be placed in an adoptive home. McGinnis also testified that she did not anticipate any problem in finding a home for Jeremy.

In summary, the evidence clearly and convincingly demonstrates that (1) the Stuarts' family life has traditionally been nomadic and unstable; (2) the Stuarts have engaged in conduct which presents a danger to Jeremy; (3) Jeremy needs to be in a stable family environment where he can attend school; and (4) Jeremy is readily adoptable. We hold therefore, that the trial court did not err in concluding that termination of the parent-child relationship is in Jeremy's best interest.

Although the Stuarts do assert alternatively that the trial court erred in finding that it was not in Jeremy's best interest to place him in the custody of the Gunters, we note that they have not made any argument or cited any authority in support of this claim. Accordingly, we consider it waived. *Interest of T.L.H., supra.*

In conclusion, we have carefully reviewed the record and find clear and convincing evidence to support the trial court's finding that Lloyd and Susan Stuart 1) engaged in conduct which endangers Jeremy's physical and emotional well being, and 2) have been the major cause of Jeremy's failure to be enrolled in school. Therefore, the Stuarts' conduct with respect to Jeremy satisfies the sec. 15.02(1) termination requirement under both subsection (E) and subsection (J)(i). We further find clear and convincing evidence to support the trial court's finding that termination is in Jeremy's best interest. There-

**282**

fore, sec. 15.02(2) is also satisfied, and the trial court properly terminated the parent-child relationship under sec. 15.02.

The judgment is affirmed.