# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00564-CV

**Valancia Roxanne Comer, Appellant**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT NO. FM201555, HONORABLE PATRICK O. KEEL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Valancia Roxanne Comer appeals from the district court's final decree terminating her parental rights to J.F. and C.F. on the grounds that she engaged in conduct or knowingly placed them with persons who engaged in conduct which endangered their physical or emotional well-being and that termination was in their best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(E), (2) (West 2002). Comer challenges only the second element. She contends that the evidence is legally and factually insufficient to support the finding that termination of the parent-child relationship was in the children's best interest. Because the evidence is legally and factually sufficient to support those findings and conclusions, we will affirm the order.

**BACKGROUND**

Comer is the natural mother of J.F., born March 31, 1997, and C.F., born July 9, 1998.[1]  On March 1, 2002, the Texas Department of Protective and Regulatory Services ("Department") received a referral alleging physical abuse and neglectful supervision, stating that Comer had cut C.F.'s thumb with a knife to discipline her for sucking her thumb.[2]  The Department removed the children from Comer's care and interviewed Comer, who was uncooperative and belligerent.  She cursed staff and refused to leave until law enforcement was called and escorted her out.[3]  The Department then filed this suit seeking to terminate Comer's parental rights to both children.

The referral for the thumb-cutting was not the first contact Comer had with the Department.  Five years earlier, the Department made a finding of neglectful supervision[4] of J.F.

---

[1]  Comer has a third child who was not yet born at the time of these incidents and who is not a subject of this case.

[2]  On February 18, 2003, Comer pleaded guilty to a charge of felony injury to a child in a separate criminal case based on this incident.  She received a ten-year sentence probated to eight years.

[3]  A staff member testified that often parents are allowed to see and speak to their children who have been removed so that they can comfort the children but that Comer could not be calmed enough for the Department to expose her children to her at the interview.

[4]  The Department must make investigations of allegations of abuse or neglect, which culminate in written reports used to help determine the Department's next step.  Tex. Fam. Code Ann. § 261.301-12 (West 2002).  If staff determines that abuse or neglect has occurred, the case disposition is "reason to believe" and the case may not be administratively closed.  40 Tex. Admin. Code § 700.511(a)(1), (a)(5), (b)(5) (2004).  Except in cases of administrative closure or other exceptions not relevant here, the Department must assess the likelihood of future abuse or neglect and determine whether child protective services are needed, providing them if necessary.  *Id.* § 700.514.

after Comer and Joe Fitzgerald, J.F.'s father, had a violent altercation while J.F. was in the room. There was a history of abuse in the relationship, including Fitzgerald's having caused Comer to miscarry an earlier pregnancy. During the altercation Comer and Fitzgerald threw objects, endangering J.F. In that altercation she hit Fitzgerald in the head with an iron and stabbed him in the side. Comer claimed to be trying to protect herself and the baby, but she was convicted of assault with bodily injury and sentenced to a year's confinement, reduced to twenty-four months of community supervision.

In 1998, the infant C.F. arrived at day care with severe burns on her leg.[5] Comer had placed a hot bottle in C.F.'s lap. When C.F. cried, Comer picked her up and held her, then put her back in her carseat with the bottle and sent her with a friend to be transported to day care. C.F. continued to cry during the twenty-minute car trip, but the transporter also did not realize that the baby was being burned. Comer explained that she had boiled the bottle but refrigerated it for fifteen minutes before placing it in her daughter's carseat. The Department investigated the incident and found reason to believe Comer failed to properly supervise C.F. by placing hot bottles in her carseat. *See* 40 Tex. Admin. Code § 700.511 (a)(1) (2004). Although the Department found neglectful supervision, it did not find reason to believe that intentional abuse had occurred. A mental health expert testified that because Comer suffers from post traumatic stress disorder stemming from severe childhood physical and sexual abuse and because of her learning disability, borderline mental retardation, Comer does not cope well with new, complex, or hectic situations, such as the one that existed the morning C.F. was burned.

---

[5] Four years later the scar remaining from the burns was five to six inches in diameter.

3

In June of 2001, the Department investigated another neglectful supervision allegation after Comer left J.F. and C.F. in the supervision of George Lewis, who was homeless and battling a drug problem. Comer allowed Lewis to live with her and the children despite his history of physically abusing her. One day when Comer returned home, Lewis told her he was moving out of town and left. Comer noticed that C.F. was behaving strangely and had trouble urinating. Comer questioned both children, who told her Lewis had sexually abused C.F.; she then called 911 and took C.F. to the doctor. The Department was unable to determine whether Comer's actions constituted neglectful supervision.[6]

In the current case, Comer participated in various court-ordered services such as family and individual therapy, anger management and parenting classes, and the court ordered the children returned to her in August 2002. Neither the Department nor the court knew at the time that Comer's boyfriend, John Payton, was living with her. During the fall of 2002, Payton and Comer were involved in numerous violent domestic disputes, sometimes in the presence of the children. In November, Comer learned that Payton had robbed a grocery store, but still allowed him to live with her and the children. On November 14, Comer finally informed her counselor that she was involved in an abusive relationship and wanted to end it. They discussed plans for Comer to safely leave Payton, including calling the police, using SafePlace's shelter,[7] or moving without his

---

[6] The Department marks cases "unable to determine" when it can neither substantiate nor rule out an allegation. 40 Tex. Admin. Code § 700.511(a)(4) (2004). In this case, the Department expressed concern about Comer's having left the children with Lewis, given her knowledge of him, but found she appropriately responded to the sexual abuse outcry.

[7] SafePlace is an organization that provides shelter and services to battered women. Comer and the children had formerly lived in SafePlace housing.

knowledge. Comer confronted Payton instead, which led to physical violence witnessed by the children. Payton choked Comer and threatened her with a knife. Comer hit Payton in the head with a curtain rod, injuring him.[8] Comer claims that she was also injured, but the police did not see signs of physical injury. Comer was arrested for assault with injury, family violence. She spent a month in jail, during which time Comer's sister cared for J.F. and C.F. After Payton wrote Comer a letter offering to tell the authorities he had hit her first and that she had acted in self-defense, the charges were dropped.

When the Department learned of the incident and the children's whereabouts, it removed the children to an emergency shelter. Comer resumed individual therapy and classes in parenting, anger management, and domestic violence after her release from jail. She also maintained contact with Payton, who was in jail for the grocery store robbery. She visited him and wrote him letters as late as June 2003 while representing to the Department and the court that they no longer had contact. Comer testified that she planned to get a protective order against Payton but was waiting until she knew when he would get out of jail.

Department evaluations in the record as well as testimony below indicate that both children's maturation and social development appear to be impaired. J.F. suffers developmental delay in language and motor and cognitive functioning; his speech is difficult to understand, and he displays aggressive behavior with other children and adults. J.F. is destructive during therapy and

---

[8] Comer has testified that she hit Payton with the curtain rod because she could not find a hammer.

at home; he responds with physical aggression and obscenity to boundaries set by adults. J.F. has required hospitalization because he is a danger to himself and others. C.F. is a friendly, verbal child who shows mild difficulty adhering to appropriate behavioral boundaries. She is at times aggressive and disrespectful of others' body space. She has been observed acting out sexually, but is generally a happy and interactive child.

J.F. and C.F. currently live with their foster mother, Mary Mosley. Mosley, who would like to adopt both children, provides structure, patience, and nurturing for the children. J.F.'s violent behavior has worsened and he may require time in a residential treatment center where 24-hour therapy and supervision are available, but Mosley testified that she would adopt J.F. even if residential treatment becomes necessary. Mosley has supported contact between the children and Comer in the past, and testified that she would continue to allow it if the children's therapist recommended it in the future. However, frequent visits with Comer may hamper the children's ability to feel permanence and security. J.F. in particular escalates his acting out because he wants to go home, but both children want to go home with Comer.

Following a bench trial, the court found that Comer engaged in conduct and knowingly placed the children with others who engaged in conduct that endangered the physical and emotional well-being of the children, and that the Department proved by clear and convincing evidence that termination of the parent-child relationship and the appointment of the Department as non-parent sole managing conservator of J.F. and C.F. was in the best interest of the children. This appeal followed.

6

Comer challenges the legal and factual sufficiency of the evidence supporting certain specific findings and the broader finding that termination of Comer's rights was in the children's best interest. She does not challenge the finding that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children, nor does she challenge the remaining specific findings of the trial court.

Parental rights may only be terminated if the Department proves and the trial court finds by clear and convincing evidence: (1) that the parent has engaged in conduct set out as statutory grounds for termination,[9] and (2) that termination is in the best interest of the children. *See* Tex. Fam. Code Ann. § 161.001 (West 2002). The Department must prove both statutory prongs; proof of one prong does not excuse it from establishing the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976). Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief or conviction of the truth of the allegations sought to be established. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (citing *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)). This heightened standard of proof is appropriate because termination is a drastic remedy of such weight and gravity that due process requires the state to justify termination of the

---

[9] In this case, the statutory grounds for termination are that Comer "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." Tex. Fam. Code Ann. § 161.001(1)(E) (West 2002).

7

parent-child relationship by more substantial proof than a preponderance of the evidence. *Id.* (citing *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980)); *see also Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982) (requiring that in termination cases "the State support its allegations by at least clear and convincing evidence"). While parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d at 26. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right. *Id.*

In reviewing a legal-sufficiency challenge, we consider all of the evidence in the light most favorable to the finding and determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). Reviewing the evidence in the light most favorable to the judgment while assuming the fact finder resolved disputed facts in favor of its finding if it is reasonable to do so gives appropriate deference to the fact finder's conclusions. *Id.* The court should disregard evidence a reasonable fact finder could have disbelieved or found incredible, but should not disregard undisputed facts that do not support the finding. *Id.*

Termination findings must be upheld against a factual sufficiency challenge if the evidence is such that a reasonable fact finder could form a firm belief or conviction that grounds exist for termination. *C.H.*, 89 S.W.3d at 18-19. This departs from the traditional factual sufficiency review, in which the court determines whether a finding is so against the great weight and preponderance of the evidence that it is manifestly unjust; the supreme court has held that the

traditional standard is inadequate in parental termination cases, which require that findings be based on clear and convincing evidence. *J.F.C.*, 96 S.W.3d at 264 (citing *C.H.*, 89 S.W.3d at 25).[10]

Comer challenges the legal and factual sufficiency of the evidence supporting fifteen of the district court's findings and three of its conclusions, which relate to Comer's acts and omissions under section 161.001(1)(E), because they may also be probative of the best interest question in 161.001(2). Although proof of grounds from section 161.001(1) does not relieve the Department from proving termination is in the best interest of the child, the same evidence may be probative of both issues. *C.H.*, 89 S.W.3d at 28. Factors to consider in determining the best interest of a child include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parenting abilities of the parent seeking custody; (5) the programs available to assist the parent seeking custody; (6) the plans for the child by the parent or agency seeking custody; (7) the stability of the home or the proposed placement; (8) any acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list is not exhaustive; other factors may be considered if appropriate. *Id*. at 372. Likewise, a fact finder is not required to consider all the listed factors in coming to a finding that termination is in a child's best interest. *Id*. That is, absence of evidence regarding some of the factors does not prevent a reasonable fact finder

---

[10] Likewise, the legal sufficiency standard of review set forth in *J.F.C.* departs from the traditional "anything more than a scintilla" legal sufficiency standard because of the heightened burden of proof required in parental rights termination cases. *See In the Interest of J.F.C.*, 96 S.W.3d at 265-66 (Tex. 2002).

from forming a strong belief or conviction that termination is in the child's best interest, particularly in cases where, as here, undisputed evidence indicates that the parental relationship endangered the child's safety. *C.H.*, 89 S.W.3d at 27. We note that this test focuses on the interest of the child, not the needs or desires of the parent. *See In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.)

At the outset of our analysis, we note that many of the trial court's findings remain unchallenged. Comer does not challenge the findings that she repeatedly entered into relationships in which her partners abused her, failed to obtain protective orders against any of her abusers,[11] and failed to remove the children to safety during repeated episodes of severe domestic violence in their presence, thus endangering the children. We do not hold Comer responsible for the abuse visited upon her. However, Comer's own choices have endangered her children, according to the unchallenged findings that she has demonstrated an inability to ensure the children's physical or emotional safety from her own violent acts as well as those of her partners. Comer admits that she pled guilty to both assault, after stabbing Joe Fitzgerald in J.F.'s presence, and injury to a child charges, after she injured C.F. by cutting C.F.'s thumb with a knife.

A separate finding that Comer failed to demonstrate adequate parenting skills by failing to protect the children from witnessing violence, by injuring C.F., and by placing them with persons who abused them also goes unchallenged. Comer does not dispute that she left C.F. with George Lewis, who sexually abused C.F., even though she knew that Lewis had been violent toward

---

[11] These abusers included Joe Fitzgerald, Gilbert Jones, George Lewis, Chris Hall, Kevin Hamilton, and John Payton.

Comer, had abused cocaine, and was homeless. She also does not dispute the finding that, knowing he had been violent towards her in the past, she left both children in the care of John Payton, who failed to retrieve the children from school. Additionally, Comer admits that she allowed her mother to supervise both children despite knowing her mother's history of physically and emotionally abusing children, abusing alcohol, being unable to safely supervise children, and continuing a relationship with a known sex offender. Comer leaves unchallenged the findings that she considered her mother and Joe Fitzgerald, who endangered J.F. by committing acts of violence against Comer in J.F.'s presence, suitable permanent placements for her children and the finding that she is unable to utilize the parenting skills necessary to ensure the children's safety in the future.

Given these unchallenged findings, the trial court could reasonably have reached its decision that it was in the children's best interest to terminate the parent-child relationship even without relying on the findings Comer believes are legally and factually insufficient. She admits that the court properly found that she endangered the children, that she failed to protect them from witnessing severe violence committed by herself and others, that she has injured C.F., and that she has placed both children with persons who abused them. In short, Comer does not have the skills to ensure these children's safety.

Although these findings are all probative of the overall endangerment finding, they are also probative of the best interest of the children issue. *See C.H.*, 89 S.W.3d at 28. These findings weigh against Comer's ability to effectively utilize parenting skills and ensure that the children will be safe from physical and emotional abuse from her or from others and in favor of the finding that it would be in the best interest of the children for her parental rights to be terminated.

11

We now turn to the challenged findings, which we group for purposes of our analysis. Comer argues that the trial court could not have reasonably formed a firm belief or conviction as to her history of relationships in which she became physically and emotionally abusive. Although Comer admits she verbally threatened a fellow resident of a battered women's shelter and physically fought another resident after refusing to leave that woman's apartment, she also refrained from retaliating on at least three occasions. However, the record shows that Comer has a long history of using verbal abuse, threats, and physical attacks upon family members, domestic partners, and others, including Department officers and police officers. She has been asked to vacate SafePlace housing for failure to obey rules regarding visits from abusive men and for violent conflicts with other residents. Since the beginning of this case, Comer admits she has maintained an abusive relationship with Payton. Given these facts, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that "Comer repeatedly entered into relationships with others in which she became physically and emotionally abusive."

Comer next attacks the findings that C.F. was severely burned while in Comer's care, causing C.F. to suffer pain and permanent scarring, and that Comer placed C.F. with a person who failed to attend to the burns or seek medical attention, thereby endangering C.F. There is no question that C.F. was severely burned while in Comer's care or that Comer placed C.F. with the transporter, who failed to attend to the child's burns or seek medical attention. Comer admits that the court could consider the burn incident in determining that Comer endangered the children, but argues that the court may not base its entire endangerment finding upon this event because it occurred before this case began. We note that Comer does not challenge the endangerment finding in this appeal and

that the court did not base its endangerment finding upon this event alone; four other unchallenged findings and one unchallenged conclusion also address endangerment. Also, although an adjudication may not be solely based upon conditions existing in the distant past, here the court could have found that the endangering conduct still persists and could have based its finding on that conduct. *Avery v. State of Texas*, 963 S.W.2d 550, 552-53 (Tex. App.—Houston [1st Dist.] 1997, no writ).[12]

Comer further argues that the findings imply knowledge of the burn and that there is no evidence the transporter knowingly failed to attend to the child. However, the findings make no assertion regarding the knowledge or intent of the transporter. She also points out that the Department's investigation did not show that she abused C.F. The Department's inability to determine abuse has no impact on the court's endangerment finding. Failure to adequately supervise and protect a child from harm can constitute endangering conduct. *See Stuart v. Tarrant County Child Welfare Unit*, 677 S.W.2d 273, 279 (Tex. App.—Ft. Worth 1983, writ ref'd n.r.e.) (terminating rights of parents who have shown that they are capable of abusing and neglecting a child because to do otherwise would endanger his emotional as well as physical well-being).

Comer challenges the finding that she was arrested for the felony offense of aggravated assault of John Payton for hitting his head with a curtain rod in the presence of the

---

[12] In *Avery*, parental rights were terminated under subsection (M), allowing termination if a parent has previously had her relationship terminated with respect to another child based on a finding that her conduct violated (D) or (E). *Avery v. State of Texas*, 963 S.W.2d 550, 552 (Tex. App.—Houston [1st Dist.] 1997, no writ). The parent argued that her former termination proceeding 17 years earlier on endangerment grounds listed in (D) and (E) was too remote to justify terminating her rights with respect to the second child, but the court found that the endangering conduct, drug abuse and criminal activity, continued after the second child's birth. *Id.*

children.  The arresting officer testified that Comer was arrested for this incident and charged with assault with injury, family violence, not aggravated assault.  Comer is correct that the evidence is legally and factually insufficient to support this finding.

Comer argues that because she complied with court-ordered therapy and the children received therapy at school, the evidence supporting the finding that she failed to meet their emotional needs by failing to take them to therapy appointments once they were returned to her is factually insufficient.  The Department offered to provide the required therapy for Comer, J.F., and C.F., and family therapy for all three, both before and after the trial court ordered Comer to attend family therapy with her children.  Although Comer testified that the children needed more than two sessions of family therapy, she only attended twice.  She also took C.F. to play therapy, but only on two occasions; eventually the children received therapy at school on a weekly basis.  Reviewing the evidence in the light most favorable to the trial court's finding, we believe a reasonable fact finder could have formed a firm belief or conviction that Comer failed to meet her children's therapeutic needs.

The trial court found that Comer's lengthy history of underemployment, unemployment, sporadic employment, and unstable housing demonstrated her inability to provide for the children's basic physical needs and that the children's home is unstable.  Comer argues that, despite her employment history, she is able to provide for the children's basic physical needs through child support, public benefits, community resources, and her church.  She asserts that, even with her frequent moves, she has been able to provide housing for her children using public and community resources and that their home is, therefore, not unstable.  Further, she asserts that her unstable

14

housing and employment would not be an issue if the court awarded her visitation without granting custody of the children. The court heard evidence that Comer suffers from a learning disability but is employable. She has been unemployed for most of her children's lives, and the family has lived in seven or eight different places, including two homeless shelters, one battered women's facility, and Comer's mother's house.[13] Viewing the evidence in the light most favorable to the finding, we believe a reasonable trier of fact could have formed a firm conviction that Comer is unable to provide for the children's basic needs, even though others often are available to help her. A reasonable fact finder could also have firmly believed that the constantly changing and at times unsafe living conditions made the children's home unstable.

Comer challenges the finding that Mosley, the children's foster parent, has met the children's physical, social, and emotional needs, because Mosley has been unable to prevent J.F.'s decline into aggressive and destructive behavior. There is conflicting evidence regarding the cause. Both children want to return to their mother, and J.F's desire adversely impacts his behavior; however, the court could reasonably have found that J.F.'s desire to return home is not the sole cause of his aggression. Testimony from Shannon Strong, the children's court-appointed special advocate, indicates that J.F. is mimicking violence he has seen by Payton and Comer. There is also conflicting

---

[13] The Department determined that Comer's mother's house is not a suitable home for children. Department records and a home study indicate that, as a child, Comer was removed from her parents' care and raised in foster homes because her father sexually abused her and both parents physically abused her. Comer's mother attempted to hit the father in the head with a skillet when she found out about the sexual abuse, but still maintains that she does not believe any sexual abuse ever occurred. She was convicted of felony retaliation against Department officers after her children were removed well over a decade ago, and Department records indicate that she still threatens them. Comer's mother predicts that she might, in time, trust Comer's father to babysit J.F. and C.F. alone if the occasion arose.

evidence about whether J.F. is bonding with Mosley. Comer argues that J.F.'s desire to be with her and his uncontrollable behavior are evidence that Mosley cannot meet his emotional needs. Comer refers to his aggression toward and refusals to communicate with Mosley, requests for his mother, attacks, and threats as evidence that J.F. would be better off with Comer. However, Dawn Marie Nichols, a conservatorship officer at the Department, testified J.F. cannot follow Comer's direction either, that he screams, kicks, and slams doors with her, and that he hits and bites her. Witnesses testified that the children both have a strong bond with Comer and also that they are developing bonds with Mosley.

Mosley and several caseworkers testified that, while living with Mosley, J.F. and C.F. have received adequate food, clothing, shelter, education, medical and dental treatment, weekly play therapy, psychiatric care, medication, male mentoring, speech therapy, and socialization with family members and peers. Ms. Strong testified that their environment with Mosley is stable and their needs are being met. She testified that J.F. and C.F. are unusually gentle with Mosley, that they understand their boundaries with her, and that they turn to her for comfort. We assume that the fact finder resolved these evidentiary disputes in favor of its finding, about which the trial court could reasonably have been firmly convicted.

The court found that Comer failed to learn and apply the skills from Department and outside resources,[14] and the services provided have been unsuccessful. Comer has utilized numerous

---

[14] The following resources were made available: parenting and anger management classes; group, family, and individual therapy; psychological and psychiatric evaluations; residential treatment; shelter and housing assistance; intensive family reunification services; home studies on others who could help Comer with the children; waiver of child support; and assistance with transportation, housing, and work referrals.

resources to help her properly care for herself and her children, including at least three sets of parenting classes, at least three series of anger management classes, domestic violence classes, and SafePlace counseling on violence, particularly how to choose safe men and control anger.

According to Ms. Nichols, these resources did not effect an obvious change. While living at SafePlace, Comer had at least two boyfriends who entered the property and abused her, even after her lease was changed to prohibit visitors, but Comer did not press charges or obtain protective orders despite education and encouragement from SafePlace staff members. Comer was eventually asked to leave SafePlace because of repeated rule violations including violent conflicts with other residents despite SafePlace and other counseling against violence.

After J.F. and C.F. were removed from her care, Comer was involved in intensive family reunification services and counseling when she allowed Payton, who told her he had just finished a prison term, to move in with her. She insisted that she was not involved in any relationship until it was discovered that she was pregnant; at that time, despite what she had learned, she refused to provide information for the Department to run a background check on Payton. When that relationship became abusive, Comer did not seek assistance from her church support network, friends, therapist, Department caseworker, the children's court appointed special advocate, or the court. According to her therapist, although Comer was working with her therapist to understand the impact of domestic violence on children, her pattern of choosing violent men and becoming violent herself, and safe solutions to problems with violence, Comer on one occasion responded to provocation from Payton by throwing his belongings off a balcony. Later, after Comer discussed with her counselor plans for Comer to safely end the relationship, Comer confronted Payton, which

17

resulted in violence and her arrest for assault. Comer and the counselor testified that her confrontational approach ran counter to the counselor's advice and Comer's planning while in therapy. During the morning-long conflict, Comer spoke to church members and her sister but never requested help or told them about the situation because she wanted to take care of her issues by herself.

Upon her release from jail, Comer participated in more therapy and training to recognize, avoid, and escape batterers, including discussing the past relationship with Payton and what Comer might do differently in future relationships. Still, she continued her relationship with Payton, who was in jail at the time. Comer testified that she did so either because she thought he had changed or because she was afraid of him. Comer also continued anger management classes after her release from jail and believes she can control herself, but when the Department began to intervene with her third baby, she became overwrought and threatened suicide. Comer maintains that she now realizes she needs help and vows to ask for help in the future. However, Comer has said so in former court proceedings as well, and the court could reasonably have formed a firm belief that Comer has failed to effectively learn and apply skills from the resources provided. Comer's past performance as a parent has a bearing on her fitness to care for these children in the future, especially where her conduct endangering the children may recur, and where she has been unable to meet the children's physical and emotional needs. *See C.H.*, 89 S.W.3d at 28; *D.O. v. Texas Dep't of Human Serv's*, 851 S.W.2d 351, 356 (Tex. App.—Austin 1993, no writ) (considering past conduct as evidence of future inability to care for child).

Comer challenges the court's finding that her relationship with the children is more of a peer relationship than a parent-child relationship because she has provided food, clothing, shelter, attention, and grooming to the children, and makes sure their medical needs are met. There is testimony from Comer's mother, Gail Marshall Clark, that she is a good mother, takes care of the children's needs, and does not relate to them merely as a playmate. However, Ms. Strong and Ms. Nicholson testified that visitation with Comer has been mainly silliness and playtime and that Comer has trouble following through with redirection. Comer testified that J.F. acted as though he wanted to beat up Payton when he abused Comer and that C.F. tried to help her during at least one violent incident. The court could reasonably have resolved this evidentiary dispute against Comer, and could have been convinced that the children see themselves as Comer's equals and protectors.

Comer challenges the court's findings indicating that it would be in the best interest of J.F. and C.F. for her parental rights to be terminated and for the Department to be appointed sole managing conservator so that Mosley may adopt the children. Comer contends that no reasonable fact finder could conclude that termination of her parental rights served the children's best interest because it is the outcome least likely to guarantee their continued contact with her. The court had evidence that guaranteeing contact with Comer and preventing adoption was not in the children's best interest. While there was testimony that there is a bond between J.F., C.F., and Comer, there was also testimony that a bond was developing with Mosley, that Comer has difficulty controlling herself and that the children are not better off having contact with her. One caseworker believed that limiting J.F.'s contact with Comer might help him by giving him more permanency in his current setting. The children's advocate also opined that increased visitation with their mother was not the

right route for the children, and that it might not be effective because it exacerbates their desire to go home with her. Ms. Nicholson's testimony emphasized that the children might never experience closure under long-term foster care, which Comer urges us to consider if she cannot have custody of the children. Adoption by Mosley would be possible only after Comer's parental rights were terminated. Ms. Nicholson testified that these "children need a sense of permanency, a sense of belonging instead of being in foster care, maybe with the possibility of jumping from home to home." The government has a compelling interest in establishing a stable, permanent home for a child; the need for permanence is a paramount consideration in evaluating a child's present and future emotional needs. *In re M.A.N.M.*, 75 S.W.3d 73, 77 (Tex. App.—San Antonio 2002, no pet.); *see also Holley*, 544 S.W.2d at 372 (listing emotional needs among important factors in determining best interest). Given the opinion testimony at trial regarding the children's best interest and all the evidence available in this case, a reasonable trier of fact could firmly believe that terminating Comer's rights and allowing adoption would be in J.F.'s and C.F.'s best interest.

Here, the evidence is legally and factually sufficient to support the trial court's finding that it was in the children's best interest to terminate parental rights. The finding that Comer was arrested for aggravated assault instead of assault with injury, family violence, was not supported by the evidence. Even without that finding, however, the court could have reasonably formed a firm belief or conviction that termination is in the children's best interest. We uphold each of the other individual findings against Comer's legal and factual sufficiency challenges because, in each instance, the evidence was sufficient to allow a reasonable trier of fact to form a firm belief or conviction that the particular finding was true. *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 18-19.

20

**CONCLUSION**

The evidence in this case was legally and factually sufficient to support the court's findings and conclusions that termination of Comer's parental rights was in the best interest of the children, J.F. and C.F. We affirm the order of the trial court terminating the parent-child relationship.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   December 2, 2004

21