

NUMBER 13-13-00095-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

### IN THE INTEREST OF C.S. A CHILD

### On appeal from the 343rd District Court of San Patricio County, Texas.

## MEMORANDUM OPINION

### Before Justices Rodriguez, Benavides and Longoria
### Memorandum Opinion by Justice Longoria

This is a termination of parental rights case involving one parent. By his first two issues, appellant R.S. challenges the sufficiency of the evidence supporting the jury's verdict terminating his parental rights over his daughter C.S.[1]  See TEX. FAM. CODE ANN. §§ 161.001(1)(D), 161.001(2) (West Supp. 2012).  By his third issue, appellant argues that he received ineffective assistance of counsel at trial.  We affirm.

---

[1] Because this is a parental termination case, in order to protect the identity of the child, we refer to the other members of appellant's family by their initials or by an alias.  See TEX. R. APP. P. 9.8(b).

# I. BACKGROUND

The State of Texas, through the Department of Family and Protective Services, ("the Department"), filed a petition to terminate the parental rights of appellant and C.H. to their child C.S, who was seven months old at the time of the original referral to Child Protective Services ("CPS") and almost two years old at the time of trial. On November 22, 2011, CPS received a referral alleging that appellant and C.H. were neglectfully supervising their children. CPS was originally referred because both appellant and C.H. had been arrested earlier that day for domestic violence, and there was no one to supervise their two children, C.S. and E.H. The Department later moved to terminate the parental rights of both appellant and C.H. over C.S. C.H. died of an overdose of prescription medication before trial, and E.H. was placed with a family friend who later adopted him.

## A. Rendon's Testimony

Jennifer Rendon, an investigator for the Department, testified that at the time of her visit there were two children in the house, C.S. and E.H. Appellant's mother, Nancy and C.H.'s mother, Mary, were also present at the time of Rendon's visit.[2] Mary suffers from Alzheimer's disease and was unable to answer more than a few of Rendon's questions before "she'd travel back to the past." Rendon testified that she contacted both appellant and C.H. in jail to discuss placement options for the two children. Rendon testified that C.H. appeared to be under the influence of prescription drugs during their initial interview. C.H. informed Rendon that "she was not going to place [C.S.] out and that she had an attorney and that I needed to contact her attorney." Rendon testified that appellant offered Nancy as a potential placement option for C.S.

_____

[2] We will refer to these two women by these aliases for the purpose of this appeal.

2

Rendon recalled that the Department did not place C.S. with Nancy because of Nancy's past criminal history. On direct examination from C.S.'s attorney ad litem, Rendon testified that Nancy explained to her that the altercation that led to the initial referral started because appellant insisted that C.H. take E.H. to school but appellant refused to drive them. Appellant and C.H. began to fight after C.H. stated that if appellant would not take them, C.H. would go for a walk and take C.S. with her. Appellant did not want C.H. to take C.S. with her while she was under the influence of prescription medication, and began to strike her while she was still holding C.S.

Rendon testified that the house was not "unlivable," but that it was "cluttered" and had an odor due to a dead dog underneath the home. Rendon testified that there was some food in the kitchen refrigerator. Rendon investigated the prescription drug issue and found "a lot of pills" that were under Mary's name. Rendon stated that Mary had been prescribed medication two days prior to the day of Rendon's visit but most of the medication was already gone. Rendon testified that Nancy explained to her that appellant and C.H. had been living in Nancy's house "for like a week" because the electricity had been turned off in their previous residence in Corpus Christi, which was owned by Mary.

On cross examination, Rendon testified that CPS had investigated C.H. in the past for "abuse or neglect" of E.H. and for abuse of her mother's prescription medication. None of those investigations involved appellant. Rendon stated in her report at the time that C.H. was believed to be a "pill head" but that appellant was "not known to use any drugs." Rendon also stated that the first thing C.H. told her when she made contact was that she was a victim of "severe domestic violence."

3

## B. Mary Martinez's Testimony

Mary Alice Martinez, a conservatorship worker for the Department, also testified. Martinez presented a family service plan to appellant and C.H., which they were required to complete in order to regain custody of C.S. Martinez testified that appellant completed the required drug testing. Appellant attended half of the required parenting classes until he was arrested for violating his probation by committing domestic violence against C.H. Martinez also testified that appellant and C.H. began the individual counseling sessions required by the plan, but that appellant did not complete them after he claims that his attorney advised them to stop attending the sessions unless he was present. In any event, we note that appellant could not have completed the classes because he was arrested for domestic violence after beginning the classes. Martinez further testified that the family plan also required that appellant and C.H. maintain appropriate housing but that there "was always a question as to where [C.H. and appellant] were residing." Appellant and C.H. were living with Nancy at the time of his arrest because the electricity had been turned off at their other house in Corpus Christi. Martinez also testified that appellant did not pay the $10 in monthly child support required by the court.

Martinez testified that, in sum, the Department decided they would move to terminate appellant's parental rights because of his history of domestic violence in relationships, which we discuss below in the context of appellant's testimony; the fact that C.H. was abusing prescription drugs extensively but appellant still left C.S. in her care; his inability to provide a stable environment and adequate housing for C.S.; his past failure to provide his other three children with financial support or maintain a

4

relationship with them; and that there were no other good options for placing C.S. with a family member.

Martinez confirmed on cross examination that appellant had tested negative on all but one drug test administered to him by the Department and that the positive result was caused by medication he had been prescribed by a physician.

### C. Appellant's Testimony

Appellant testified that he has been diagnosed with bipolar disorder, depression, and suffers great pain from a back injury suffered in a rollover accident. He testified that at the time of the trial he was committed to a Substance Abuse Felony Punishment Facility (SAFPF), was not taking any prescription medications, and did not intend to refill any of his prescriptions once he was released from the SAFPF. He testified that his only current income is a $695 state disability check but that he plans to go back to work when he is released from the SAFPF. Appellant testified that his uncle has offered him a job at $14 an hour, which he described as a "firm offer."

Appellant testified that he has three other children by other women. Appellant admitted that he has never been able to provide a home for them and that his parental rights over two of his other children were terminated because, among other things, he did not support them. Appellant also admitted that he had pleaded guilty to three crimes of domestic violence against C.H.: assault family violence with a prior conviction against C.H.; making terroristic threats; and violation of a protective order. Appellant denied that he was at fault in the circumstances that led to the charges and testified that whenever appellant tried to take her pills away, C.H. would call the police and claim that he assaulted her. Appellant testified that he nevertheless decided to plead guilty

5

against the advice of his attorneys in order to "get out of jail quick, and get back to my baby [C.S.]." He testified that he knew that C.H. "was not stable and able to take care of [C.S.]," and he wanted to get back to his child as soon as possible. He also acknowledged that the convictions resulted in being away from C.S. for a long period of time. Appellant explained the specific domestic violence incident that prompted the referral to the Department by stating that C.H. wanted to take C.S. walking even though C.H. was under the influence of prescription medication. Appellant explained that he was "trying to protect my daughter." He also testified that he had actually paid $10 in child support to C.S. as ordered by the court, but that he paid it directly to her instead of to the Department.

Appellant testified that he plans to live with C.S. in the upper floor of a home owned by his grandparents once he is released from the SAFPF program. Appellant plans to pay his grandparents $300–400 in monthly rent and will also pay them for child care. He testified that he believes he will be able to earn a monthly income of at least $400 a week working for his uncle. Appellant further testified that he plans to continue counseling for the symptoms of his bipolar disorder and to continue attending Alcoholics Anonymous meetings because he is an alcoholic. Appellant acknowledged that he and C.H. were living in Nancy's house at the time of the referral because the utilities had been turned off in their house due to nonpayment. He also admitted that he left C.S. in the care of C.H. and her sister-in-law even though the two women would abuse prescription medications and "pass out together." Appellant denied that his sister-in-law ever passed out when helping C.H. care for C.S.

6

### D. V.G.'s Testimony

A woman named V.G. also testified for the Department; V.G. is the mother of one of appellant's other children. She testified that she has an eleven-year-old son with appellant and that appellant was "emotionally, physically and mentally abusive" during their relationship, which lasted for less than a year. She told the court that on one occasion appellant "jumped and elbowed my stomach repeatedly" while she was pregnant with his child. At other times, appellant had "punched, slapped, thrown around, and choked" her. V.G. also stated that on one particular occasion appellant "punched me point blank in the face" while she was holding their child in her arms. She also testified that appellant tried to release his paternal rights to their child but "for some reason or another, it couldn't happen." V.G. also explained that appellant almost never paid child support, but acknowledged that he might have occasionally paid it.[3]

### E. Cindy Dyar's Testimony

Cindy Dyar, a court appointed special advocate, testified for the Department. Dyar testified that she has worked C.S.'s case for over a year. Dyar testified that she believed terminating appellant's parental rights was in C.S.'s best interests because of his past history of abuse and anger issues. She reasoned that caring for a young child is stressful, and she does not know how appellant would react to that stress given his history of violent behavior.

### F. Foster Mother's Testimony

C.S.'s current foster parent, S.W., also testified for the Department. She testified that she and C.S. have bonded and that C.S. participates in S.W.'s activities with her extended family. S.W. further testified that C.S. "was very sick" when the Department

---

[3] The trial court overruled appellant's objection to the relevance of V.G.'s testimony.

first placed her in S.W.'s home and was taking a powerful antibiotic. The child also had "horrible diaper rash," diarrhea, and seemed "pretty listless." S.W. further testified that C.S. has "reactive airway disease," requires daily allergy medication and an inhaler, and that C.S. might be diagnosed with asthma when she is older. S.W. testified that she and C.S. have bonded, and that she plans to petition for adoption if appellant's parental rights are terminated. S.W. also introduced a Christmas photo from last year that featured C.S. and described C.S.'s current living arrangements, including the contents of C.S.'s room in S.W.'s house.[4]

### G. Jury's Verdict

The court submitted three grounds for termination to the jury. The jury answered "yes" to the question asking whether it found that appellant "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" and also found that it was in the best interests of C.S. that appellant's parental rights to her be terminated. *See* TEX. FAM. CODE ANN. §§ 161.001(1)(D), 161.001(2) (West Supp. 2012). The jury did not make a finding on the other grounds.[5] Appellant made no post-trial motions, and this appeal followed.

---

[4] Appellant complains of almost the whole of S.W.'s testimony in his third issue.

[5] These grounds are not relevant to our opinion because "a parental rights termination order can be upheld only on grounds both pleaded by [the Department] and found by the trial court." *Ruiz v. Tex. Dept. of Family and Protective Servs.*, 212 S.W.3d 804, 814 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (op. on reh'g).

## II. DISCUSSION

### A. Issues One and Two — Sufficiency of the Evidence

#### 1. Standard of Review and Applicable Law

"Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them." *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent. *Id.* (citing *In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2006, no pet.)).

A court may order the parent-child relationship terminated upon a finding supported by clear and convincing evidence that the parent engaged in certain conduct specific in section 161.001 of the family code, and that termination is in the best interests of the child. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). The State must establish both elements; termination may not be based solely on the best interests of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Clear and convincing evidence is defined by the family code as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008). This is an intermediate standard that "falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings." *In re L.J.N.*, 329 S.W.3d at 671 (citing *In re E.M.E.*, 234 S.W.3d 71, 73 (Tex. App.—El Paso 2007, no pet.)).

The Texas Supreme Court has explained the unique procedure for reviewing the legal sufficiency of the evidence in a parental termination case as follows:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

> If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. Rendition of judgment in favor of the parent would generally be required if there is legally insufficient evidence.

*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) (citations omitted); *see In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005).

In a factual sufficiency review, "[w]e must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated a provision of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child." *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.) (citing *In re C.H.*, 89 S.W.3d at 26). Under this standard, we consider:

> whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a

10

factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*In re J.F.C.*, 96 S.W.3d at 266 (citations omitted). However, an appellate court's review "must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d at 26.

Section 161.001(1)(D) provides, in relevant part, that a court may terminate the parent-child relationship if it finds by clear and convincing evidence that the parent has: "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(D). Generally, "endanger means to expose to loss or injury or to jeopardize." *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (citing *Boyd*, 727 S.W.2d at 533). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re D.J.H.*, 381 S.W.3d 606, 613 (Tex. App.—San Antonio 2012, no pet.)

> Under subsection (D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child . . . . Parental and caregiver illegal drug use . . . likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being.

*In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth, 2003, no pet.). (citations omitted).[6] "[A]busive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a

---

[6] Put another way, subsection (D) involves the child's whole "living environment, rather than the parent's conduct, though the parental conduct is certainly relevant to the child's environment." *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

child," *id.* at 125, "but it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re J.R.*, 171 S.W.3d at 569. Under section 161.001(D), "the relevant time frame to determine whether there is clear and convincing evidence of endangerment" is before the children were removed from the parent's care. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.).

### 2. Analysis

In his first two issues, appellant argues that the evidence is legally and factually insufficient to find that appellant knowingly placed C.S. in dangerous conditions and that terminating his parental rights over C.S. was in her best interests. The State argues that appellant failed to preserve his legal and factual sufficiency complaints. We agree.

Following a jury trial, a challenge to the legal sufficiency of the evidence must be preserved in one of five ways: "(1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the question to the jury; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial." *In re D.J.J.*, 178 S.W.3d 424, 426–27 (Tex. App.—Fort Worth 2005, no pet.). The Texas Supreme Court has expressly approved a substantively identical analysis, concluding that the appellant in a parental-rights termination case failed to preserve error by not taking one of these actions. *In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) (observing that the court of appeals "correctly held" that appellant failed to preserve a legal sufficiency "no evidence point" by one of these methods). Because appellant did not preserve error by one of these methods, we hold that he has failed to preserve his legal sufficiency challenge for our review. *In re D.J.J.*, 178 S.W.3d at 426–27; *see also In re J.J.F.*, No. 09-10-120-CV, 2011 WL 1842738, at *1 (Tex.

12

App.—Beaumont 2011, no pet.); *In re B.K.D.*, 131 S.W.3d 10, 15 (Tex. App.—Fort Worth 2003, pet. denied); *In re J.M.S.*, 43 S.W.3d 60, 62 (Tex. App.—Houston 2001, no pet.). Similarly, "[i]n order to present a challenge to the factual sufficiency of the evidence on appeal, it must be preserved in the trial court by pursuing a motion for new trial." *In re J.M.S.*, 43 S.W.3d at 62; *see* TEX. R. CIV. P. 324(b)(2). Appellant failed to make a motion for new trial. Accordingly, we hold that he failed to preserve his factual sufficiency challenge, as well. *See* TEX. R. CIV. P. 324(b)(2); *see also In re A.M.*, 385 S.W.3d 74, 78–79 (Tex. App.—Waco 2012, pet. denied); *In re D.J.J.*, 178 S.W.3d at 426–27; *In re B.K.D.*, 131 S.W.3d at 15–16; *In re I.V.*, 61 S.W.3d 789, 794 (Tex. App.—Corpus Christi 2001, no pet.), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d at 267 & n.39.

We overrule appellant's first two issues.

**B. Ineffective Assistance of Counsel**

Appellant argues in his third issue that his trial counsel was ineffective for failing to object to much of the testimony of C.S.'s foster mother, S.W.

**1. Applicable Law**

In order to successfully argue an ineffective assistance of counsel claim in a parental termination case, an appellant must show that "his or her counsel's performance was deficient and that this deficiency prejudiced the defense." *In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). In other words, appellant must meet the familiar and heavy burden of *Strickland v. Washington*, and prove by a preponderance of evidence that: (1) his trial counsel's representation fell below an objective standard of reasonableness; and (2)

13

there is a reasonable probability that the result of the proceeding would have been different but for the attorney's deficient performance. *Strickland*, 466 U.S. at 687; *see In re M.S.*, 115 S.W.3d 534, 544–45 (Tex. 2003) (applying the *Strickland* standard to parental termination cases).

In evaluating counsel's performance under the first part of the test, "we must give great deference to counsel's performance, indulging 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' including the possibility that counsel's actions are strategic.'" *In re M.S.*, 115 S.W.3d at 545; *see In re K.K.*, 180 S.W.3d 681, 684–85 (Tex. App.—Waco 2005, no pet., order.). In order to overcome this presumption, "[t]he record must be sufficiently developed." *In re J.W.*, 113 S.W.3d 605, 616 (Tex. App.—Dallas 2003, no pet.) (op. on remand) (citing *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999)); *see Doe v. Brazoria County Child Protective Servs.*, 226 S.W.3d 563, 572 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("*Strickland's* appellate 'record' requirement also applies to ineffective assistance claims in termination cases."). Direct appeal is therefore usually inadequate to make an ineffectiveness claim because the record is often undeveloped. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *see Thompson*, 9 S.W.3d at 813–14. This is especially true when the claim is based on trial counsel's failure to do something, and counsel's reasons "do not appear in the record." *Goodspeed*, 187 S.W.3d at 392. The court of criminal appeals has explained that "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). Absent an opportunity to explain their strategy, Texas appellate courts should "not find deficient

performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Goodspeed*, 187 S.W.3d at 392 (citing *Garcia v. State*, 57 S.W.3d 426, 440 (Tex. Crim. App. 2001)); *see In re M.S.*, 115 S.W.3d at 545.

### 2. Analysis

Appellant essentially complains that his trial counsel was ineffective because he did not object to the whole of the testimony of S.W., C.S.'s foster mother. S.W. testified in response to questions from C.S.'s attorney ad litem that she planned to petition to adopt C.S. if appellant's rights were terminated and that the Department already conducted a home study and approved her for adoption. S.W. also described C.S.'s health problems when C.S. was first placed with her, and discussed the challenges she will face caring for C.S. if she does adopts C.S. In addition, she testified that C.S. "had developmental issues" when she first gained custody, although a CPS report stated that C.S. was "developmentally on target." On redirect from the Department's attorney, S.W. described the amenities and contents of C.S.'s room at S.W.'s house. Appellant argues here that S.W.'s testimony was irrelevant to the issue of termination and that he suffered prejudice as a result because the testimony encouraged the jury "to make its decision about the merits of termination on the basis that the environment possible offered by the foster mother was much better than the upbringing that [appellant] could give his child" rather than the merits of the Department's case.

The record is silent as to trial counsel's reasons for failing to object to S.W.'s testimony and appellant is therefore unable to rebut the strong presumption under the *Strickland* framework that his trial counsel's failure to object was part of professionally reasonable representation. *See In re J.W.*, 113 S.W.3d at 616; *see also In re K.K.*, No.

15

10-04-303-CV, 2006 WL 561820, at *3 (Tex. App.—Waco March 8, 2006, no pet.) (Observing that "the lack of a record is practically always fatal" to an ineffective assistance of counsel claim on direct appeal.).

Although the foregoing is therefore sufficient to dispose of appellant's claim of ineffective assistance of counsel, in the exercise of our discretion we will address the prejudice prong of the *Strickland* test. *See Thompson*, 9 S.W.3d at 813 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."). Appellant's assertion that he suffered prejudice from S.W.'s testimony because "[t]estimony about adoption is irrelevant and inadmissible," is incorrect. On the contrary, evidence about the intention of the Department or of the child's current foster parents "are, of course, relevant" to determining the best interests of the child.[7] *In re C.H.*, 89 S.W.3d at 28; *see also In re K.S.*, No. 13-11-683-CV, 2012 WL 2947806, at *10 (Tex. App.—Corpus Christi July 19, 2012, no pet.). Appellant is correct that "[t]ermination should not be used to merely reallocate children to better and more prosperous parents." *In re W.C.*, 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no pet.). Appellant does not explain how this testimony evidenced the State's attempt to transfer C.S. to more economically prosperous parents or encouraged the jury to make its decision on that basis. The record shows that S.W. merely described C.S.'s current living conditions and S.W.'s plans for C.S. in the event that appellant's parental rights were terminated. This is exactly the type of evidence that the Texas Supreme Court has deemed relevant to determining the best interests of the child. *See In re C.H.*, 89 S.W.3d at 28.

---

[7] The case appellant cites in direct support of this assertion was reversed by the Texas Supreme Court. *Vanessa W. v. Tex. Dept. of Human Servs.,* 810 S.W.2d 744, 749 (Tex. App.—Dallas 1991), *rev'd,* 817 S.W.2d 62, 63 (Tex. 1991) (per curiam).

16

Appellant's third issue is overruled.[8]

### III. CONCLUSION

We affirm the judgment of termination.

_____
NORA L. LONGORIA
Justice

Delivered and filed the
25th day of July, 2013.

---

[8] We take this opportunity to note that as Texas law currently stands, there is an inconsistency between the right of a parent to effective assistance of counsel during a proceeding to terminate their parental rights and the remedy available to effectively vindicate that right. The Texas Supreme Court has affirmatively ruled that parents have a right to effective assistance of counsel because "it would seem a useless gesture on the one hand to recognize the importance of counsel in termination proceedings . . . and, on the other hand, not require that counsel to perform effectively." *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003) (quotations omitted). In criminal cases, most ineffective assistance of counsel claims are brought through the writ of habeas corpus because "the record is generally undeveloped" on direct appeal. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). The United States Supreme Court recently observed in a criminal case from Texas that "[t]he structure and design of the Texas system in actual operation . . . make it 'virtually impossible' for an ineffective assistance claim to be presented on direct review." *Trevino v. Thaler*, No. 11-10189, 569 U.S. _, 133 S.Ct. 1911, 1915 (2013). However, a writ is not available to parents appealing the termination of their parental rights. *In re K.K.*, 180 S.W.3d 681, 686 (Tex. App.—Waco 2005, no pet.). Because habeas is effectively necessary to make a claim of ineffective assistance, the right to effective assistance of counsel in parental termination cases becomes a 'right without a remedy' in all but a few cases.